Carole Anderson ROMASANTA, et al., and Liane Buix McDonald, on her own behalf and on behalf of all others, Plaintiffs-Appellants-Cross-Appellees,

v.

UNITED AIR LINES, INC., a corporation, Defendant-Appellee-Cross-Appellant,

Association of Flight Attendants, Intervenor-Appellee.

Nos. 82–2647, 82–6660 and 82–2661.

United States Court of Appeals, Seventh Circuit.

Argued May 9, 1983.

Decided Sept. 21, 1983.

Rehearing and Rehearing En Banc Denied Oct. 20 and Nov. 18, 1983.

Thomas R. Meites, Meites & Frackmam, Kenneth N. Flaxman, Chicago, Ill., Judy Trent Ellis, E.E.O.C., Washington, D.C., for plaintiffs-appellants-cross-appellees.

Stephen B. Moldof, Cohen, Weiss & Simon, New York City, for intervenor-appellee.

Paul M. Tschirhart, United Air Lines, Inc., Chicago, Ill., for defendant-appellee-cross-appellant.

Before PELL and CUDAHY, Circuit Judges, and GIBSON, Senior Circuit Judge.[*]

PELL, Circuit Judge.

These interlocutory appeals concern the district court's determinations, following a hearing, as to the seniority relief to which former flight attendants of United Air Lines, Inc. (United), who left United because of that airline's "no-marriage" rule, are entitled upon reinstatement with the airline.

The principal issue raised on appeal is whether the district court properly applied the rule in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), in granting seniority for competitive purposes equal only to the number of days the claimants had previously been employed as flight attendants by United. On cross-appeal, United challenges the grant of seniority retroactive to date of original hire for purposes of compensation and other non-competitive benefits. Consolidated with this appeal and cross-appeal is the class' appeal from the district court's denial of injunctive relief upon United's recall in October, 1982, of 175 furloughed flight attendants.

## I. BACKGROUND

### A. *Prior Proceedings*

Prior to November, 1968, United prohibited the continued employment as a flight attendant of any female employee who married. United also employed a small number of male flight attendants who were permitted to retain their positions after marriage. On November 7, 1968, United

and the flight attendants' union agreed to revoke this no-marriage rule. Reinstatement was offered to those flight attendants terminated because of the rule only if they had filed a grievance with the union or a complaint with the Equal Employment Opportunity Commission (EEOC).

On November 27, 1968, Mary Burke Sprogis brought suit in the Northern District of Illinois alleging that the no-marriage rule was violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–17 (Title VII). The district court granted summary judgment in favor of Sprogis. *Sprogis v. United Air Lines, Inc.,* 308 F.Supp. 959 (N.D.Ill.1970). That result was affirmed by a majority of this court in June, 1971. *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194 (7th Cir.1971).

During pendency of the *Sprogis* appeal, Carole Anderson Romasanta filed a class action in the Northern District of Illinois on behalf of herself and other United flight attendants terminated because of the no-marriage rule. The district court ruled that the *Romasanta* case should not proceed as a class action but by individual intervention of those discharged flight attendants who had either filed a union grievance or an EEOC complaint. A settlement was reached by the parties providing for reinstatement and backpay awards to the plaintiffs and a final order was entered by the district court approving the settlement.

One of the discharged flight attendants who had been excluded from the *Romasanta* case because of the adverse class ruling, Liane Buix McDonald (McDonald), sought to intervene to challenge the class determination. The district court denied intervention and an appeal was taken to this court. A majority of this court reversed, remanding the case with instructions to permit McDonald to intervene, to treat the case as a class action, and to fashion relief for the class. *Romasanta v. United Air Lines, Inc.,* 537 F.2d 915, 920 (7th Cir.1976), *aff'd sub nom. United Airlines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977).

On remand, the district court limited the class to persons actually discharged by United. Those who had resigned because of the rule were excluded. This court again reversed, holding that resigners were entitled to be class members and noting that the class might include all persons who left United because of the rule within the period from ninety days before the filing of EEOC charges to the date on which the no-marriage rule was abolished. *McDonald v. United Air Lines, Inc.,* 587 F.2d 357 (7th Cir.1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979).

On remand, the Association of Flight Attendants (AFA), the union representing incumbent flight attendants at United, was permitted to intervene. After notice was given, approximately 1,750 potential class members were identified. Before the commencement of individual hearings to determine actual class membership, United and the AFA successfully urged that the district court hold an evidentiary hearing to determine whether reinstatement with retroactive seniority to the date of original hire would result in an "unusual adverse impact" on incumbent flight attendants, *see, Franks v. Bowman Transportation Co.,* 424 U.S. 776, 779 n. 41, 96 S.Ct. at 1270, 1271 n. 41 (1976). In the course of the ensuing hearing, the class plaintiffs clarified that they sought reinstatement only as openings among the ranks of flight attendants occurred (openings proposal) rather than immediate reinstatement of the entire class.

In a memorandum and order issued January 8, 1982, the district judge found the openings proposal, as conditioned by the class, to be unworkable. He also found that "unusual adverse impact" would surely result if the class members were reinstated immediately with full retroactive seniority for competitive purposes. The relief granted credited the class members with seniority based on the number of days they had actually worked at United as flight attendants for those benefits requiring competition among flight attendants. The district judge granted the claimants seniority from date of original hire for those benefits representing a cost to the airline but not im-

pacting directly on incumbent flight attendants. The class immediately filed a motion to reconsider, urging that they at least be accorded "relative seniority" for competitive purposes (relative seniority proposal). Under this proposal, a class member whose seniority for competitive purposes placed her at the ninetieth percentile when she left United would be inserted into the current seniority list at that same percentile. This motion was denied without opinion. On July 12, 1982, the district judge issued an order implementing his earlier memorandum and order. He certified for immediate appeal the question whether less than full retroactive seniority could be granted class members for competitive purposes. *See* 28 U.S.C. § 1292(b). The class' appeal on that issue, No. 82–2660, and United's cross-appeal pertaining to the award of full retroactive seniority for purposes of compensation and other company benefits, No. 82–2661, followed.

In August, 1982, United indicated that it would recall 175 flight attendants from furlough on October 1. The plaintiff class sought to enjoin this recall, believing that it prejudiced the seniority rights awarded claimants pursuant to the order of July 12, 1982. The district court denied the requested stay, refused to require the recall of claimants rather than furloughees, and declined to rule on the claimant class' alternative request that they be permitted to accrue seniority during the period of the recall. The plaintiffs' appeal from this ruling, No. 82–2647, has been consolidated with Nos. 82–2660 and 82–2661 for purposes of argument and decision.

### B.   Factual Background Relevant to Reinstatement Issues

#### 1.   Competitive and Company Seniority.

Seniority is extremely relevant to the flight attendant position. The term "seniority" is used in several different contexts. The first, company seniority, determines a flight attendant's number of vacation days and the number of passes to which he or she is entitled, as well as other similar benefits provided by the airline. Company seniority reflects the employee's total service with the airline. Because all of the matters determined by company seniority represent a cost to the airline, but are not otherwise limited in their availability, the amount of company seniority awarded the class members is extremely important to United but has little direct impact on incumbent flight attendants.      •

Classification seniority, on the other hand, reflects the amount of time an employee has worked as a flight attendant. Classification seniority is utilized in an absolute sense to determine the flight attendant's salary. Like company seniority, the classification seniority awarded class members for purposes of salary calculation is of primary concern to United and of minimal concern to incumbent flight attendants.

Classification seniority also is utilized in a relative sense and is pertinent to those aspects of the flight attendant job that require United to distinguish among the flight attendants. For instance, the airline maintains eleven separate "domiciles" to which flight attendants are assigned. Some, like Seattle and Miami, are considered far more attractive by flight attendants than others, such as Chicago. Because flight attendants bid for domiciles based on their classification seniority, the flight attendant with the greatest classification seniority relative to other flight attendants, has the best chance of being stationed where she chooses. The impact of relative classification seniority, therefore, is directly felt by other flight attendants. Because of this effect, we will hereafter in this opinion refer to such seniority as "competitive seniority." [1]

Besides determining the attendant's domicile, competitive seniority is utilized in furloughing, or laying off, flight attendants if such action is required, with the least senior employee being the one most vulnerable to furlough. Within each domicile, competitive seniority determines whether the flight attendant is a "lineholder," who flies a pre-

---

1.  "Competitive seniority" is therefore synony-      mous to "relative classification seniority."

determined fixed monthly schedule, or one who must serve on "reserve," in which case the flight attendant's lines of flying are determined by the airline, at its option, and according to its needs. Competitive seniority also determines whether the individual will work only during weekdays or also during the weekend and whether he or she will work a flight that offers premium pay. Finally, and of extreme importance to the flight attendants, whether one is subject to involuntary transfer to a different domicile is determined by competitive seniority within the domicile from which the flight attendants are to be transferred.

Although much of the evidence presented in the trial below on reinstatement issues will be developed later in this opinion, it is important to note that assignment of a domicile is considered extremely important by flight attendants. The evidence indicated, for instance, that some flight attendants would be more willing to fly "reserve" at a more desirable domicile than to be a lineholder at a less desirable domicile. Accordingly, the possibility of involuntary transfers is regarded with great concern. Such a transfer presents the flight attendant with a choice of relocating or "commuting" from one's home to one's domicile. The cost of commuting—both in terms of time and money—are significant. Similarly, the costs of relocation can be exceedingly high in personal terms, particularly if the flight attendant has been assigned to one domicile for a lengthy period of time and/or has a spouse and children with work and community ties in that locale.

Not surprisingly, the other part of the flight attendant experience affected by competitive seniority that is of overriding concern to flight attendants is the possibility of furloughs. A furloughed flight attendant does not receive regular compensation during the furlough, does not continue

to accrue seniority, and all recall rights are extinguished after the lapse of five years.

2. Economic factors.

Particularly relevant to disposition of this case are economic factors affecting United in the past several years. In the years 1979, 1980, and 1981, United experienced operating losses, after taking into account the tax advantages of these losses, of $99,583,000, $15,043,000, and $104,368,000, respectively. Undoubtedly reflecting this economic picture, United has not hired a single flight attendant since 1979 and has furloughed 1,530 employees during that period. Although 547 of these employees were furloughed because of cutbacks necessitated by the air traffic controller's strike in 1981, and one would therefore assume their lay-off to be temporary, the AFA brief submitted in this case indicates that there are currently 1,255 furloughed flight attendants.

The district court also found that reinstatement of 1,480 claimants[2] would create an immediate non-recurring cost to United in excess of $10,000,000. The annual recurring cost to the airline of reinstating the claimants would be approximately $21,000,000.

3. Factors Not Yet Determined by the District Court.

Although this court has accepted this interlocutory appeal on the reinstatement issues, there are several facts not yet determined that are relevant to the seniority issues we address herein. First, the size of the class is not yet certain. Subsequent to oral argument in this case, hearings before special masters have commenced. The purpose of these hearings is to determine whether a claimant left United because of the no-marriage rule or for other reasons. Only upon completion of these hearings will

---

**2.** As discussed in Section II, *infra,* the district judge determined that the figure 1,400 represented a reasonable estimate of class members likely to seek reinstatement by United. Accordingly, he utilized that figure throughout his memorandum opinion. The only exception is in the findings regarding costs to United resulting from reinstatement of the class. Only United presented evidence on that point and, in so doing, United assumed that 1,480, rather than 1,400, class members would seek reinstatement. The district judge similarly utilized the 1,480 figure for purposes of this one issue and, in footnote, explained his reasons for doing so.

there be certainty as to the size of the class. Whether all class members, once they are determined, will actually seek reinstatement is similarly unknown.[3]

Second, the district court held hearings in November and December, 1982, relating to the issues of back pay and front pay for class members in this action. Front pay is the amount that United would be required to pay class members while they await actual reinstatement by the airline. Although the district judge did not consider the impact of front pay in his order, that potential cost is relevant to this appeal. Because of the financial impact it would have on United, the airline has indicated that it both could, consistent with the collective bargaining agreement, and would furlough incumbent flight attendants in order to permit a more rapid reinstatement of claimants.

## II. ISSUES RAISED BY INTERVENOR BARR

The initial issue we must consider is whether the district court's use of the number 1,400 as an estimate of class members likely to seek reinstatement misrepresents the size of the class and prejudices the results of analyzing the impact on incumbents of the proposed seniority remedies. Joyce Barr, a member of the class represented by McDonald, urges that a substantially smaller number should be utilized and that the class should be subdivided between those former flight attendants who want to return to work and those who primarily seek a financial remedy.

Barr's argument is that the number 1,400 is unrealistic because many of the persons who responded to the class notice will be unable to prove that they left United because of the no-marriage rule and, of those who survive that threshold determination, many will not want to return to a position they left fifteen or more years ago. Barr asserts that McDonald is using this inflated number in order to force financial concessions from the airline. The result is that those class members who actively want to return to United are being sacrificed to a litigation strategy that favors those seeking financial benefits, rather than work, from this suit.

Contrary to Barr's contentions, the 1,400 figure is not simply McDonald's estimate. It is the number upon which the AFA, United, and McDonald agreed at pretrial conferences in September, 1980, and February, 1981, because all the parties recognized that some figure had to be used for purposes of resolving the reinstatement issues in this case. By the time the hearing below was held, all three parties were urging different numbers, of which McDonald's, 1,069, was the lowest.

The district court utilized the figure 1,400 after carefully analyzing the methodology used by McDonald in arriving at the 1,069 figure. The district judge's conclusion was that any one mistaken assumption in McDonald's calculations would raise the figure by three to five hundred class members and therefore the 1,400 figure was more realistic.

The real difficulty here, as recognized by the judge below, is that the relevant assumptions are untestable. Only after the conclusion of the class membership hearings now in progress, and scheduled over the next two to three years, will it be clear who is in the class. Even that figure may not reflect the number of claimants who finally seek reinstatement. That variable is virtually impossible to assess at this time, especially because the attractiveness of reinstatement may depend, in the view of some claimants, on the resolution of this appeal.

In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 376, 97 S.Ct. 1843, 1875, 52 L.Ed.2d 396 (1977), the Court observed that until "both the number of identifiable victims and the consequent extent of necessary relief have been determined, it is not possible to evaluate the abstract claims concerning the equitable balance that should be struck between the

---

**3.** In portions of this opinion, the term "class members" is used in speaking of all those persons who potentially will be found entitled to relief and who will seek reinstatement.

statutory rights of victims and the contractual rights of nonvictim employees." This passage suggests that the reinstatement issues now before this court would be better addressed by the district court only after the number of persons at least *entitled* to reinstatement is determined. Delaying resolution of the seniority questions to that time would be the only practical way of responding to intervenor Barr's concerns.

The district court decided to proceed, however, and this court has accepted the resulting interlocutory appeal, because a case that has already been unresolved too long threatens to extend indefinitely if resolution of the seniority questions are delayed until completion of the class eligibility hearings. Because the district court found it imperative to proceed before the precise number of class members was determined, we can demand no more than that the estimate of class members reflect the varying positions of the parties and that the basis for choosing the figure 1,400 be demonstrated in the record. Both conditions are satisfied here.

Not only do we find the number 1,400 a reasonable estimate of persons who will seek reinstatement, but, like the district court, we are persuaded that McDonald is not undermining the interests of some members of the class. She has presented alternative proposals regarding seniority relief, briefed each at length, and actively sought full, retroactive seniority for class members. We find no error in the district court's refusal to subdivide the class. Not only is subclassing unnecessary in view of McDonald's vigorous representation, but it would be impossible to determine at this point which potential class members "really" want to return to their positions at United and which "really" seek only a financial remedy.

In light of our decision that the district court did not err in utilizing the figure

1,400 and in refusing to subdivide the claimant class, we hereby deny the various motions pending before this court that pertain to materials bearing on a reevaluation of the number of claimants likely to seek reinstatement.[4]

## III. COMPETITIVE SENIORITY

The primary issue raised by the plaintiffs on this appeal is whether the district judge abused his discretion, particularly in view of *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (*Franks*), in declining to grant the class members full, retroactive competitive seniority upon their being rehired by United. The class members are entitled, under the court's ruling, to only the competitive seniority they had actually accrued at the time they left United because of the no-marriage rule.

### A. Franks *and Its Progeny*

In *Franks,* the Supreme Court, reversing the Fifth Circuit, held that nonemployees who had applied for and been refused employment as over-the-road truck drivers by Bowman Transportation Co. (Bowman) solely because of their race were entitled, pursuant to Title VII, to seniority status retroactive to the dates of their employment applications. The Supreme Court reasoned that one of the central purposes of Title VII is " 'to make persons whole for injuries suffered on account of unlawful employment discrimination.' " 424 U.S. at 763, 96 S.Ct. at 1263 (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)), and that ordinarily a grant of seniority reflecting the discrimination victim's date of application is necessary to achieve that "make-whole" purpose, 424 U.S. at 766–67, 96 S.Ct. at 1265.

---

4. The following motions are accordingly denied: (1) Intervenor Barr's motion to supplement record on appeal (filed 5/13/83); (2) AFA's motion for leave to comment on intervenor Barr's Circuit Rule 11 submissions (filed 5/18/83); (3) class' motion for leave to file response to post-argument submissions (filed 4/20/83); (4) response of intervenor Barr to AFA's motion for leave to file comment (filed 5/20/83); and (5) response of AFA to class' motion to file response to post-argument submissions (filed 5/27/83).

One of the arguments advanced by Bowman in support of the lower courts' refusal to grant the seniority relief was that the district court had correctly exercised its discretion in denying retroactive seniority because of the competing interests of incumbent employees. The Supreme Court rejected this argument for two reasons: first, because the district court had not mentioned these considerations in denying the relief,[5] and, second, because " '[i]f relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.' " *Id.* at 775, 96 S.Ct. at 1269 (quoting *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 663 (2nd Cir.1971)). Although the Court recognized that the burden of granting competitive seniority falls primarily on innocent incumbent employees, *see* 424 U.S. at 773 n. 33, 776–78, 96 S.Ct. at 1268 n. 33, 1270–71, it held that a "sharing of the burden of past discrimination" is "presumptively necessary," *id.* at 777, 96 S.Ct. at 1270.

The Court recognized, however, that an award of full, retroactive seniority may not be appropriate in every case. In footnote, the Court clarified that it did not intend to abrogate the equity powers of the district courts:

> Rather our holding is that in exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful-place seniority relief, and proceed with further legal analysis from that point; and that such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases.

*Id.* at 779 n. 41, 96 S.Ct. at 1271 n. 41.

The appellants interpret *Franks* as holding that a diminution of incumbents' job expectations can *never* constitute unusual adverse impact. Although they are less explicit as to what would, in their view, constitute the degree of impact envisioned by the *Franks* Court as sufficient to preclude the granting of full, retroactive seniority, two possibilities are suggested. First, circumstances unrelated to the impact on incumbents might support a finding of unusual adverse impact. Second, implementing a seniority remedy so as to cause the discharge of incumbent employees might result in "unusual adverse impact."

We find little support in *Franks,* the appellate decisions of this and other courts that have applied *Franks,* or the Supreme Court disposition in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (*Teamsters*), for such a limited interpretation of the "unusual adverse impact" standard. Because the *Franks* Court was well aware that the burden of granting retroactive seniority to discrimination victims falls primarily on innocent incumbents, *see* 424 U.S. at 773 n. 33, 776–78, 96 S.Ct. at 1268 n. 33, 1270–71, there is no basis in either law or logic for concluding that "unusual adverse impact" must reflect factors unrelated to the impact of the remedy upon incumbent employees. Similarly, the *Franks* opinion nowhere states that *only* the resulting discharge of incumbents will constitute unusual adverse impact. What *Franks* does clarify is that full retroactive seniority should not be routinely denied discrimination victims merely because such relief will have some impact, as it always will, on incumbents. Because neither the district nor appellate courts in *Franks* had relied on the competing rights of incumbents as a ground for denying seniority relief, the impact in that case was indeed "abstract," *id.* at 779 n. 41, 96 S.Ct. at 1271 n. 41, and was not demonstrated by "facts and circumstances that would not generally be found in Title VII cases," *id.*

---

**5.** There is no indication in the *Franks* opinion that the question of impact on incumbents had even been presented to the district court.

Our conclusion that *Franks* did not limit the "unusual adverse impact" inquiry to the extent urged by the class is supported by the Supreme Court disposition in *Teamsters*. Again emphasizing that it is within the equitable discretion of the district court, in the first instance, to fashion a seniority remedy, the Court referred to the "equitable balance that should be struck between the statutory rights of victims and the contractual rights of nonvictim employees," 431 U.S. at 376, 97 S.Ct. at 1875, and suggested in footnote that the number of victims, the number of non-victim employees affected, the alternatives available to incumbents, and the economic circumstances of the industry would be relevant to the district court's exercise of discretion, *id.* at 376 n. 62, 97 S.Ct. at 1875, n. 62. Focusing on the timing of the equitable remedy, the Court observed that:

> Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling competing interests," in order to determine the "special blend of what is necessary, what is fair, and what is workable."

*Id.* at 375, 97 S.Ct. at 1874 (citation omitted).

The courts of appeals similarly have not read *Franks* as mandating so limited an inquiry as that urged by the class. For instance, in *Moore v. City of San Jose,* 615 F.2d 1265, 1272 (9th Cir.1980), the Ninth Circuit noted the district court's findings that, not only would no incumbent lose his job, but that the seniority relief granted the twelve class members would have "minimal" impact on the incumbent workforce of 590 people. In *Air Line Stewards and Stewardesses Association, Local 550 v. Trans World Airlines, Inc.,* 630 F.2d 1164,

1169 (7th Cir.1980), *aff'd sub nom. Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), this court relied in part on the likelihood that the claimants, who constituted three percent of the incumbent workforce, could be reinstated in less than one-half year through normal attrition. In *Air Line Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 573 F.2d 960 (7th Cir.1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190, this court relied in part on the representation made to the district court that the class members, who again constituted approximately three percent of the incumbent workforce, would return only to domiciles where openings occurred. *Id.* This court also noted that the district court had made "an admirable effort to sort out the likely impact of and the 'balance of equities' surrounding the provision of retroactive occupational seniority," *id.* at 965, and had assured itself that no present employees would lose their jobs and "also that the number of returning employees was not so large as to create undue problems," *id.* Finally, in *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256 (2nd Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982), the Second Circuit, in affirming the district court's order of a freeze on incumbent promotions in order to equalize promotional seniority among current employees and victims of discrimination, noted that it was possible the City could act to minimize the burden on incumbents. *Id.* at 287.

■ The appellate cases discussed above compel the conclusion that courts have considered numerous factors, not just whether current employees would lose their jobs, in granting or reviewing a grant of seniority relief.[6] We therefore reject the appellants'

---

**6.** The only court of appeals case that arguably could be construed to hold that it is an abuse of discretion, under *Franks,* not to grant full, retroactive competitive seniority is *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256 (2nd Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). In a portion of that opin-

ion not discussed *supra,* the Second Circuit held that the district court had erred in granting less than all the benefits of seniority to discrimination victims. The court noted that the plaintiffs had not specified what benefits they had been denied, *id.* at 288, but suggested that the plaintiffs should be provided with vacation and sickpay appropriate to their "right-

argument that the court below abused its discretion in considering the many different kinds of impact a grant of full, retroactive seniority would have on those persons currently employed by United as flight attendants.

## B. Application of Franks and Teamsters to this Case

*Franks* mandates that a finding of "unusual adverse impact" be based on factors not generally found in a Title VII case. 424 U.S. at 779 n. 41, 96 S.Ct. at 1271 n. 41. *Teamsters* suggests that the relevant considerations would include the number of victims, the number of non-victim employees affected, the alternatives available to incumbents, and the economic circumstances of the industry. 431 U.S. at 376 n. 62, 97 S.Ct. at 1875 n. 62.

Relying on the first two factors enunciated in *Teamsters,* the appellants argue that the ratio of class members to incumbents in this case, sixteen percent, is less than that in *Franks, Teamsters,* and *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256 (2nd Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982).[7] Because none of those cases precluded an award of

full, retroactive competitive seniority, and particularly because the Second Circuit in the *Bridgeport* case held that the district court had abused its discretion in ordering less than full seniority, the appellants claim that the judge below should have ordered the full measure of competitive seniority.

■ The difficulty with the class' argument is that it focuses on only two of the factors enunciated by the *Teamsters* Court. The current economic conditions affecting the airline industry are extremely relevant to the present case and, under *Teamsters,* were properly considered by the district court. By contrast, economic considerations have not been deemed pertinent to other courts of appeals decisions regarding competitive seniority. We conclude, therefore, that the prior case law has limited relevance to evaluation of the district court's application of *Franks* and *Teamsters* to this case[8] and reject the appellants' suggestion that an award of retroactive competitive seniority is required in this case because of the ratio of class members to incumbents.

Having determined that the district court neither ignored nor misapplied the controlling principles of law, our task on review is to determine whether evidence in the record

ful place" in the seniority system and should have the benefits of seniority for purposes of avoiding lay-off if the City maintained a last-hired-first-fired seniority system.

Initially, we note that benefits such as vacation days and sick pay are not within the realm of "competitive" seniority. To the extent that the Second Circuit *did* order an award of competitive seniority without the benefit of any inquiry into what impact that relief might have on incumbent employees, we decline to follow the *Bridgeport* court's interpretation of *Franks* in light of this court's previous observation that it is both proper and necessary to "sort out the likely impact of and the 'balance of equities' surrounding the provision of retroactive occupational seniority." *Air Line Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 573 F.2d 960, 965 (7th Cir. 1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190.

**7.** The appellants assert that the class members in *Bridgeport* constituted twenty percent of the incumbent workforce. This represents the ratio of the 102 persons ordered entitled to priority in hiring by the district court to the workforce of 512. Because the court of appeals

reduced the number on the priority hiring list to 73, the correct percentage would appear to be fourteen percent.

**8.** Having determined that *Franks* and *Teamsters* require the district court to evaluate carefully the many facets of impact that an award of competitive seniority will have on innocent, incumbent employees, the fact that we herein review the district court's *denial,* as a matter of discretion, of full competitive seniority relief further distinguishes this case from previous decisions in which this and other courts of appeals have reviewed a *grant* of full seniority. *See, e.g., Air Line Stewards and Stewardesses Association, Local 550 v. Trans World Airlines, Inc.,* 630 F.2d 1164 (7th Cir.1980), *aff'd sub nom. Zipes v. Trans World Airlines, Inc.,* 445 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Moore v. City of San Jose,* 615 F.2d 1265, 1271–72 (9th Cir.1980); *Air Line Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 573 F.2d 960 (7th Cir.1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190.

supports its conclusions that an award of full, retroactive competitive seniority would result in an "unusual adverse impact" on incumbents. Before undertaking that review, however, we address the appellants' contention that the district court mischaracterized the relief they sought.

During the course of the trial below on reinstatement issues, the class clarified that it sought reinstatement at United only as openings permitted. This proposal was conditioned in several ways, which are developed in detail, *infra.* In his memorandum opinion, the district judge did consider this openings proposal. He found it unworkable because of the conditions upon which the class insisted. The district court then also considered the impact of *immediate* reinstatement of all the class members and concluded that "unusual adverse impact" would result. He similarly considered the impact that would result *if* the openings proposal were workable and were implemented and, as to some of the categories of consequences reviewed, found it to be somewhat less than the impact of immediate reinstatement.

We find no error in the district court's consideration of the impact that would result from immediate reinstatement of the class. Such analysis was wholly appropriate in light of the mandate in *Franks* and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), that the district court should fashion a remedy that would "make [the class] whole" for the injuries suffered as a result of discrimination. Further, the district court did not ignore the openings proposal but, rather, found it both unworkable and the cause of significant, adverse impact on incumbents if it *were* workable. We are not persuaded, therefore, that the district court's "error" lay in its mischaracterization of the relief sought by the class.

*C. Review of the District Court's Findings*

■ A total of three proposals regarding seniority relief were presented by the class. We first review the findings regarding immediate reinstatement of the class.

Second, we review the determinations regarding the openings proposal and, finally, we consider the class' request for relative seniority.

Throughout his opinion, the district judge grouped the consequences of granting the requested relief as follows: (1) the possibility of furloughs and firings; (2) the potential for involuntary transfers; (3) demotions to reserves; (4) impact on lineholder schedules; (5) the economic impact on United; and (6) the impact on minority hiring. The findings of "unusual adverse impact" relate primarily to the considerations relevant to groups (1) and (2). In reviewing the lower court's findings, therefore, we shall address primarily the possibility of furloughs and firings and the potential for involuntary transfers.

1. Immediate Reinstatement.

The district judge found that if the 1,400 class members were immediately reinstated by United, all incumbent attendants hired by United since March 7, 1977, would be furloughed. Those incumbents who were furloughed would suffer immediate financial consequences from loss of income. Further, it is possible that many of those furloughed as a result of reinstating the class, as well as those flight attendants already on furlough, would not be recalled before the five-year limit and would therefore effectively be "fired."

As discussed in Section III(A), *supra,* the appellants themselves seem to suggest that a discharge of incumbents because of relief granted to discrimination victims might constitute "unusual adverse impact." The combination of a very large class and an economically depressed airline industry might well result in a significant number of current United flight attendants losing their jobs. We find ample support in the record for this finding and for the district judge's conclusion that such an impact would be "unusually adverse."

Immediate reinstatement would also result in a large number of involuntary transfers. As indicated *supra,* United maintains eleven separate domiciles for which flight

attendants "bid" based on their seniority. Working from the assumption that returning class members would seek assignment to the domicile nearest their current residence, the district judge found that 147 claimants would choose to go to Seattle, one of the most popular domiciles. If they did, thirty-five percent of the flight attendants currently domiciled in Seattle would be subject to involuntary transfer to another domicile. Those subject to transfer would be all Seattle-based flight attendants hired after September 30, 1969.

Because the popular Miami domicile is considerably smaller than the Seattle one, the impact there would be even more striking. If the 143 claimants who live nearest the Miami domicile all returned, seventy-six percent of the current Miami domiciliaries would be subject to transfer. This would include all flight attendants currently stationed in Miami who were hired after February 28, 1966.

The effect of an involuntary transfer is to force a flight attendant either to disrupt his or her family and community life or to commute to the new domicile. There is evidence in the record of this case that many of these displaced incumbent flight attendants would resign their positions with United rather than suffer the disruption associated with transfer or incur the costs, in both time and money, involved in commuting.

Choosing to resign in the face of two equally unsatisfactory alternatives—relocating or commuting—may be marginally preferable to being furloughed for an extended time or effectively discharged upon the expiration of recall rights. The difference, however, is merely a matter of degree. There is ample evidence in the record to support the district judge's findings regarding the impact of involuntary transfers on incumbents and the likelihood that such transfers would result from the immediate reinstatement of the class members. We cannot say that the district judge abused his discretion in characterizing this impact as unusually adverse.

Of the other consequences of immediate reinstatement discussed by the district court, the most significant is the impact on minority flight attendants currently employed by United. Pursuant to a consent decree entered in 1976, *EEOC v. United Airlines, Inc.,* No. 73 C 973 (N.D.Ill.1976), *aff'd,* 560 F.2d 224 (7th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 764 (1978), United has hired an increasing number of flight attendants who are members of minority groups in recent years. Accordingly, these persons have relatively low seniority. They would, therefore, be more affected as a group by the immediate reinstatement of the class than the other incumbent flight attendants. Evidence in the record suggests that immediate rehiring of all class members would decrease the percentage of minority flight attendants from fifteen to ten percent. Further, because of the many furloughs that would result from implementation of this remedy, there would be less or no hiring by United in the next several years and the number of minority members working as United flight attendants would not be increased by new hires.

The judge below did not find that the consequences to minority flight attendants would, by themselves, constitute "unusual adverse impact." Nonetheless, we believe the district judge correctly considered this impact to be significant. When it is considered along with the possibility of furloughs, possible firings, and involuntary transfers, the impact on minorities buttresses the district court's conclusion that "unusual adverse impact" would result if the class members were immediately reinstated.

2. Openings Proposal.

■ The claimants do not suggest that they will wait passively for openings to occur among the rank of flight attendants without regard to how long the delay in reinstatement might be. The class conditioned their openings proposal on all claimants being fully reinstated within two and one-half to three years. McDonald indicated that if that timetable were not met,

she would "undoubtedly ... petition the court to modify the decree." Second, all openings were to be filled by class members before any furloughed incumbent flight attendant was recalled to work. Third, class members were to receive "front pay" consisting of full pay and benefits until all class members were reinstated.[9]

The proposal also required United to "take appropriate steps to encourage the creation of openings." Two specific suggestions were made by the class: initiation of an early retirement program and the creation of a continuing "shared work" program.

The district court found that it lacked power to impose either the early retirement or shared work program. Absent any allegation that the United-AFA collective bargaining agreement violates the Civil Rights Act or wrongfully perpetuates the effects of past discrimination, the court below lacked the power to rewrite the terms of that agreement to provide for either of the programs suggested by plaintiff class. *See Myers v. Gilman Paper Corp.,* 544 F.2d 837, 857 (5th Cir.1977), *amended and modified on other grounds,* 556 F.2d 758, *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59.

Absent affirmative action to encourage openings, the district court found that the openings proposal was unworkable, primarily because of the two and one-half to three year time limit. The feasibility of meeting the time limit turns primarily on two factors: the anticipated attrition from the ranks of flight attendants and the anticipated growth in the total number of flight attendants required by United.

Experts for both the plaintiffs and United testified as to attrition rates. The plaintiffs' expert, Dr. Carl Hoffman, predicted an attrition of between 670 and 833 flight attendants by year-end 1983. These figures represent an attrition rate of approximately three and one-half percent. United's expert, however, predicted that the attrition

rate would be something under one percent over the next five years, resulting in 367 available places for flight attendants. Judge Moran did not credit one expert over another. He noted that both were subject to challenge on methodological grounds, and "most importantly, both are subject to certain imponderables beyond the control of the airline or the flight attendants that will greatly affect the rates of attrition."

The failure to resolve definitively how much attrition will occur among United flight attendants is not critical, however, because it is clear that 1,400 class members could not be reinstated within the time frame set by McDonald without some growth in the total number of active flight attendants required by the airline.

United had originally projected an annual growth rate of four to five percent. This would have resulted in the recall of 102 furloughees in 1981. Instead, 125 flight attendants were furloughed in July, 1981. Another 350 flight attendants were furloughed in September, 1981, and because of the strike by the professional air traffic controllers and the resulting reduction in the number of United flights, another 547 were furloughed in October, 1981. United's "growth projections" for 1981 were accordingly off by 1,124 individuals.

United now projects *no* growth for the next few years. According to the brief submitted by the AFA, there are still 1,255 United flight attendants on furlough. It is apparent that, absent a dramatic change in the economies affecting the airline industry, it will be impossible for United both to recall those flight attendants currently on furlough and to provide places for the 1,400 class members within the two and one-half to three year limit set by the class. Even if the class members could all be reinstated within that period, which appears unlikely, the result is that some current furloughees would be effectively discharged at the expiration of their recall rights. This is the same effect that the district judge found,

---

**9.** As indicated in Section I(B)(3), the district court has not yet resolved the issue of front pay.

when considering immediate reinstatement of the class, to constitute "unusual adverse impact."

Even if the openings proposal were "workable," therefore, it is likely that some furloughees would eventually lose their job with United. This effect would be exacerbated if the district court awards front pay to the class and United creates artificial vacancies by furloughing incumbent flight attendants. United has indicated that it would take such action in order to avoid paying full salaries to those waiting for reinstatement. Although no award of front pay has yet been made, this possibility is relevant because it suggests that the impact of the openings proposal would be virtually indistinguishable from that of immediate reinstatement insofar as furloughs and possible firings are concerned.

Further, even if the openings proposal were workable within the conditions set by the class, there is no indication that the impact, in terms of involuntary transfers, would be appreciably less than if the class members were reinstated immediately. The greatest attrition occurs among the more junior flight attendants. As a result, the majority of openings will occur at the less popular domiciles. Because of the significant competitive seniority that returning class members would have, they would generally be able to utilize that seniority to be stationed at the domicile of their choice. There is simply no guarantee that openings would occur at the domiciles that class members would request. If they did not, incumbents now stationed at those domiciles would have to be involuntarily transferred to the less popular domiciles where the openings had occurred.

The only other alternative would be for class members to wait until an opening occurred at the domicile of his or her choice or to accept employment wherever a vacancy occurred, regardless of domicile. The class members have not indicated a willing-

ness to do either. The time limit set by the class precludes the first option which might, as the district court recognized, involve an inordinately long wait. Further, even if the class members indicated a willingness to suffer such a long delay in reinstatement, United might be expected, if front pay were awarded, to create false vacancies to put the class members back to work at domiciles of their choice. The result in this case would be virtually the same as if the class members were immediately reinstated.

Both in terms of furloughs or firings and the potential for involuntary transfers, there is ample support in the record for the district court's conclusion that the impact on incumbents resulting from implementation of the openings proposal would be only slightly less than if the entire class were immediately reinstated. More importantly, there is support for the judge's conclusion that the conditions insisted upon by the class as part of the openings proposal simply cannot be met. Bearing in mind that, in *Teamsters,* the Supreme Court indicated that in "devising and implementing remedies under Title VII ... a court must ... determine the 'special blend of what is necessary, what is fair, and what is workable,'" 431 U.S. at 375, 97 S.Ct. at 1874 (citation omitted), we find no abuse of discretion in the district court's rejection of the class' openings proposal.

### 3. Relative Seniority.

■ Pursuant to the class' motion to reconsider, the district judge considered and rejected an alternative proposal which would have given class members the same "relative" seniority they had when they left United. Under this relative seniority proposal, a class member who was in the sixty-seventh percentile for seniority purposes when she left United because of the no-marriage rule would, upon reinstatement, be placed at that same percentile.[10] At the

---

**10.** The district court denied the motion to reconsider without opinion. We reject the plaintiffs' contention that the court's failure to issue an opinion constitutes "clear error" under *Franks.* The court had advised the parties,

prior to the trial on reinstatement issues, that he would consider the full "gamut" of possible seniority remedies. The detailed opinion issued by the district judge demonstrates that he fulfilled this promise. As our review of the rela-

time of the plaintiffs' terminations, sixteen percent were in the top quarter of the seniority rankings, twenty-seven percent were in the second quarter, thirty-five percent were in the third quarter, and twenty-two percent were in the bottom quarter.

Under the remedy devised by the district court, approximately ninety-three percent of the claimants will be in the bottom quarter of the seniority list. The plaintiffs argue that stagnation at the top of the seniority list means that they will remain at the bottom of the list for the rest of their careers. They therefore suggest that the relative seniority proposal at least achieves the district court's apparent goal of placing them where they were when they left United, whereas the relief granted by the court below actually gives them far less.

The difficulty with the relative seniority proposal stems largely from the change in how flight attendants view their flying experience in the 1980's as compared to the 1960's. What was once viewed as a temporary, glamorous job is now considered a career position. As a result, a flight attendant who began working for United in 1966 had accrued as much relative seniority by late 1968 as a flight attendant who began in 1970 had by 1982. The relative seniority proposal effectively equates twenty months of experience fifteen years ago to twelve years of more recent experience. Such a result places a great burden on incumbents who were in no way responsible for United's no-marriage rule.

Whether that burden would, in a different economic setting, be consistent with the shared-burden rationale articulated in *Franks,* 424 U.S. at 777, 96 S.Ct. at 1270, need not be resolved because implementation of the relative seniority proposal would, in the context of this case, result in "unusual adverse impact" on incumbents. In light of the small attrition rate at United and, more importantly, the lack of anticipated growth in the total number of flight

attendants required, the effect of granting the plaintiffs relative seniority would be to require the existence of 951 openings in the ranks of flight attendants before the most senior of the current furloughees would be recalled. Because there are currently 1,255 flight attendants on furlough, there would have to be over 2,000 openings for flight attendants within the five-year limit, at the conclusion of which furloughees lose their recall rights, in order for the class members to return to United without some percentage of incumbent furloughees losing their job as a result.

The relative seniority proposal, if implemented on an "openings" basis, as apparently the class intends, does not resolve the impossibility of reinstating the class members within the time limit set by the class. The district court found it unlikely that sufficient openings would occur to accommodate the class members if they were hired before any furloughees were recalled. Utilizing the relative seniority approach, some furloughees would be recalled before some of the least senior class members. As a result, *more* than 1,400 openings would be required to reinstate both the class and the more senior of the current furloughees within the time limit. The relative seniority proposal, implemented on an openings basis within the time limit set by the class, is even less workable than the openings approach presented by the class during the trial below.

To reintegrate immediately the 1,400 class members into the active work force, even with relative seniority, would differ from immediate recall with full seniority only in a matter of degree. The furlough of flight attendants now in active service would be necessary. The possibility is strong that many of the furloughees, quite likely those laid-off as a result of the reinstatement of the plaintiffs and almost certainly some of the present furloughees, would not be recalled within the five years and would, therefore, lose their jobs.

tive seniority proposal indicates, *see infra,* its impact is different in only a matter of degree from the proposals discussed at length by the district court. We find no error in the district

judge's failure to write yet another lengthy opinion concerning the same issues that had already been treated in depth in the memorandum opinion.

Similarly, because many of the class members would enter the ranks of flight attendants with substantial seniority, the likelihood of involuntary transfers of incumbents remains extremely high. This is true whether reinstatement were implemented immediately or on an openings basis.

In summary, we conclude that those factors compelling a conclusion of unusual adverse impact under the immediate reinstatement or openings proposals are mitigated to only a slight extent if the class members are granted relative seniority. The remaining "unusual adverse impact" on the incumbents makes this remedy, under *Franks,* inappropriate and the district judge did not abuse his discretion in declining to adopt it.

## IV. ISSUES RAISED ON CROSS–APPEAL

On cross-appeal, United urges that the district court erred in awarding the plaintiff class seniority from the date of original hire for purposes of compensation and various benefits such as the number of vacation days and number of passes a flight attendant receives.[11] Unlike competitive seniority, *see* Section I(B)(1) *supra,* the burden associated with this award of non-competitive seniority falls primarily on United rather than on incumbent flight attendants.

United asserts that *Franks* requires a district court to "balance the equities" in awarding seniority relief and offers two arguments in support of its conclusion that the equities favoring the plaintiffs are few. As discussed in Section III(A) *supra, Franks* created a presumption in favor of full retroactive seniority relief, implemented on an openings basis, in Title VII cases. *Franks,* 424 U.S. at 779 n. 41, 96 S.Ct. at 1271 n. 41. Arguably, the approach taken by the *Teamsters* Court could be characterized as a balancing of equities. 431 U.S. at 374–76, 97 S.Ct. at 1874–75. The court below reconciled the language in *Franks* and *Teamsters* by applying the *Franks* presumption, requiring United and the AFA to carry the burden of demonstrating "unusual adverse impact," and relying on the factors enumerated in *Teamsters* as relevant to that showing. Absent any explicit statement in *Teamsters* that the standard enunciated in *Franks* was no longer viable, we believe the approach taken by the district court is correct and have followed the same mode of analysis on appeal. We are not persuaded, therefore, that United's characterization of this case as one involving a mere balancing of equities is correct.

Our reluctance to resolve this case by a balancing of equities is quite relevant to evaluation of one of the arguments posed by United. United stresses the equities in its favor: that the airline promptly abrogated the no-marriage rule once it became clear that the rule violated Title VII, and that, although other airlines had similar rules during the period that United's was in effect, only United is subject to a potential liability that includes an increase in annual operating expenses of approximately $21,000,000. United also stresses the change in how flight attendants view their position—what was once a job of limited duration is now a career position—and concludes that there is only a one-in-three chance that a flight attendant who married between 1965 and 1968 would still be flying for the airline, even if the no-marriage rule had never existed. In this regard, United finds it significant that less than ten percent of the potential class members reapplied to United as preferred hires after abrogation of the rule.

Finally, United asserts that the incumbent flight attendants are extremely hostile to the class members and that such hostility, together with service reductions United will be forced to make as a result of the relief granted the class, will have a negative impact on the public served by the airline.

11. Referring to the terminology developed in Section I(B)(1), *supra,* seniority from date of original hire was awarded the class for purposes of company seniority and classification seniority utilized in the absolute sense. Apparently, compensation is the only variable determined by this absolute use of classification seniority.

Although the judge below did not address all of these factors in the portion of his opinion discussing company seniority, the district court opinion, read as a whole, does recognize the "equities" favoring United. The conclusion drawn by Judge Moran regarding these issues differs from that of United primarily because the district court read *Franks* as mandating the fullest possible relief for the class. Because we concur with the district judge's reliance on, and interpretation of, *Franks,* we are not persuaded by United's argument that the district court failed to weigh properly the equities in this case.

The second argument raised by United in support of its contention that the award of non-competitive seniority was an abuse of the district court's discretion relies on *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), and *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). United asserts that because many members of the plaintiff class did not individually file timely charges with the EEOC and did not subsequently return to United as "preferred" hires after abolition of the no-marriage rule, they have failed to meet the prerequisites necessary to an award of retroactive seniority for non-competitive purposes.[12]

In *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the plaintiff, who had left United because of the no-marriage rule,[13] did not file a charge with the EEOC within ninety days. Approximately four years later, in 1972, she returned to United but was not granted retroactive seniority upon her return. The following year, Evans filed charges with the EEOC alleging that United had discriminated against her and continued to do so. The Supreme Court held

that, because of Evans' failure to file a timely charge before the EEOC in 1968, the airline's discriminatory action in discharging her was of no legal consequence. *Id.* at 558, 97 S.Ct. at 1889. Further, the Supreme Court held that Evans demonstrated no continuing violation of Title VII because she introduced no evidence that she was being treated differently, pursuant to United's seniority system, from other flight attendants—male or female—who had been discharged for non-discriminatory reasons and subsequently rehired. *Id.*

*Evans* is distinguishable from the present case in that *Evans* was not a class action whereas the present case is. It is well established that, in a Title VII class action, unnamed plaintiffs are not precluded from class membership merely because they did not individually file timely EEOC charges. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 396, 102 S.Ct. 1127, 1134, 71 L.Ed.2d 234 (1982); *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 389 n. 6, 97 S.Ct. 2464, 2467 n. 6, 53 L.Ed.2d 423 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975). United recognizes this distinction yet urges that the failure of individual class members to file timely EEOC charges is nonetheless relevant to the "balancing of equities" required in this case. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), is relevant to this prong of United's argument.

The plaintiff class in *Zipes* involved a large percentage of persons who had neither themselves filed charges with the EEOC nor been discharged, pursuant to Trans World Airlines' rule prohibiting mothers from employment as flight attendants, within ninety days preceding the filing of charges by other class members.

---

12. United also relies on this argument as an alternative ground in support of the district court's judgment regarding competitive seniority. Because we have resolved that issue on the grounds set forth in the district court opinion,

we will not consider United's alternative ground in that context.

13. Evans is a member of the claimant class in this case.

This court had held that this subgroup of the plaintiff class was jurisdictionally barred from relying on Title VII. *In re Consolidated Pretrial Proceedings,* 582 F.2d 1142 (7th Cir.1978), *rev'd sub nom. Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

While petitions for certiorari were pending on the jurisdictional issue, the plaintiff class and the airline reached a settlement agreement that was approved by the district court and by the Seventh Circuit. That agreement provided for retroactive seniority relief for the entire class, including those members whom the Seventh Circuit had held jurisdictionally barred from Title VII relief.

Although the Supreme Court reversed the Seventh Circuit's decision regarding jurisdiction, it affirmed this court's approval of the settlement agreement. *Zipes,* 455 U.S. at 401, 102 S.Ct. at 1136. Concurring in the result as to the award of retroactive seniority, Justice Powell wrote:

> [W]hen the victims of discrimination have slept on their rights, it will often be unfair to award them full retroactive seniority at the expense of employees who may have accrued their present seniority in good faith. When timely charges have not been filed, a district court should consider these equities in determining whether to award competitive-status seniority, and the presence of a settlement between the employer and the plaintiffs should not affect the balancing of these equities.

*Id.* at 401 n. 1, 102 S.Ct. at 1137 n. 1 (opinion of Powell, J., concurring in the judgment in No. 80–951).

The above-quoted language from Justice Powell's opinion forms the primary basis for United's argument that it is inequitable to award retroactive seniority for non-competitive purposes to the plaintiff class in this action. The argument is inapposite for two reasons. First, Justice Powell's remarks are directed to competitive rather than non-competitive seniority. Second, United overlooks the fact that the class members in this case are not in the same

position of having "slept on their rights" as the subclass of plaintiffs in *Zipes.* The class membership in this case was carefully limited to include only flight attendants who had left United pursuant to the no-marriage rule *within the period from ninety days before the filing of EEOC charges* until United's abolition of the rule. Unlike the relevant subclass of plaintiffs in *Zipes, all* members of the class in the instant case have a timely EEOC charge upon which to rely. To penalize them for not having individually filed EEOC charges would be contrary to the well established rule that individual, timely filings are not essential to a class action. We therefore reject United's argument insofar as it rests on the premise that class members were remiss in not filing individual EEOC charges.

The third prong of United's argument is based on *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). In that case, several women were denied employment at Ford. An EEOC charge was filed. Two of the women obtained other employment. Ford then offered each of them the position that had previously been wrongfully denied. Ford made no offer of retroactive seniority to the date of original hire. Reversing the Fourth Circuit, the Supreme Court held that, absent unusual circumstances, an employer's unconditional offer of the job previously withheld ends the accrual of potential back pay liability.

United relies on *Ford,* by broad analogy, for the proposition that the failure of the plaintiffs to seek available rehire by United weighs the equitable balance in favor of the airline. We are not persuaded that *Ford* has relevance to the present case. Not only does this appeal not involve issues of back pay, but more importantly, it is not a case in which United unconditionally offered employment to any of the flight attendants who had left during the era of the no-marriage rule. United's "offer" was no more than a statement, in its publicity aimed at potential flight attendants, to the effect that priority would be given to applicants who had previously worked in positions in-

volving "customer service." This is obviously something short of an unconditional offer of employment made directly to the victim of discrimination. Further, although the former flight attendants *may* have known that United had abandoned its no-marriage policy and *may* have known that they would be given hiring preference if they reapplied, neither of these facts is established in the record. We therefore conclude that *Ford* has little relevance to this case.

■ We conclude that the district judge did not abuse his discretion in construing *Franks* to require an award of seniority for non-competitive purposes from date of original hire. The judge below evaluated the increased costs to United occasioned by the relief ordered and found that, in light of United's recent assumption of increased compensation costs pursuant to collective bargaining,[14] the economic impact on the airline could not be considered "unusually adverse." Although a greater measure of non-competitive than competitive seniority was awarded, the district judge sought to insure that each type of seniority relief was the maximum measure that would not result in "unusual adverse impact." We find no abuse of discretion, under *Franks,* in this approach.

## V. DENIAL OF INJUNCTIVE RELIEF

In August, 1982, United indicated that on October 1, 1982, it would recall 175 furloughees. The class petitioned for a stay of the recall. The class proposed that plaintiffs with greater days-of-service seniority (the measure of competitive seniority awarded by the district court) should be recalled instead of the incumbent furloughees or, alternatively, that action such as denying the recalled furloughees the accrual of competitive seniority should be ordered to prevent deterioration of the class' competitive position. The district judge did not grant the sought relief and, according

to the class, abused his discretion in so doing.

■ We find no abuse of discretion in the district judge's refusal to require that claimants be recalled in place of incumbent furloughees because, absent the results of *any* class membership hearings at that time, it would have been impossible to know if the claimants recalled would ultimately be found to be members of the class.

We similarly find that the district judge did not abuse his discretion in refusing to order that recalled furloughees be denied the accrual of competitive seniority. Such a denial would be contrary to the terms of the collective bargaining agreement between United and the AFA, and, absent any assertion of illegality in that agreement or an assent to the denial of competitive seniority, the district court lacked power to alter the terms of the agreement. *See Myers v. Gilman Paper Corp.,* 544 F.2d 837 (7th Cir.1977), *amended and modified on other grounds,* 556 F.2d 758, *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59.

Two other forms of relief suggested by the class pertained to the granting of extra competitive seniority to claimants in light of the recall. The district judge declined to rule on these requests.

■ The first of the alternative suggestions was to permit claimants with greater seniority than the recalled furloughees to accrue competitive seniority from the date of the recall. The primary difficulty that would arise if such relief were granted is that if the 300 to 350 claimants with greater competitive seniority than the most senior furloughees were awarded this "extra" seniority, the relief bears a limited relationship to the recall which involved only 175 furloughees. If, on the other hand, the extra seniority were awarded only the 175 most senior of the claimants, the possibility exists that the beneficiaries of this seniority

14. The district judge found that the relief ordered would result in less than a ten percent rise in gross flight compensation costs to United. In comparison to this figure, United's recent contract negotiations resulted in assumption of a twenty-three percent increase in 1980 and an additional ten percent increase in 1981.

grant would subsequently be determined not to be members of the plaintiff class.

The second of the alternatives suggested by the class was to permit all claimants to begin accruing competitive seniority from the date of the recall or from the date the district court's opinion on reinstatement questions issued. While this approach eliminates the difficulties associated with awarding extra seniority to just some of the class members, it substantially alters the reinstatement relief ordered by this district judge in his memorandum opinion. Because the district court's resolution of this extremely complicated case sought to grant class members the fullest possible seniority remedy without creating an "unusual adverse impact" on incumbents, it necessarily involved a careful balancing of rights and consequences. We cannot say that the district court abused its discretion in declining to alter that balance merely because 175 furloughees were recalled.

Although we find no abuse of discretion in the district court's failure to alter at this time the seniority remedy granted, we are cognizant that many variables remain in this case. If the economic conditions affecting United, conditions that are largely responsible for the finding of "unusual adverse impact," take a drastic turn for the better and numerous furloughees are recalled, or if the class determination hearings stretch on for longer than anticipated, it is possible that the district judge will need to make adjustments as to when class members begin accruing competitive seniority. Nothing in this opinion, of course, precludes the district judge from ordering such additional relief upon a showing that modification of the original order is required.

## CONCLUSION

Having considered all the arguments urged by the parties and intervenors on this appeal, for the reasons stated in the foregoing opinion, the judgments of the district court regarding the appropriate measure of seniority relief and the denial of injunctive relief are

AFFIRMED.