787 F.2d 318
 40 Fair Empl.Prac.Cas. 580,
39 Empl. Prac. Dec. P 35,956, 54 USLW 2509
 EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellee,
v.
The RATH PACKING COMPANY, Appellants.
District Local 431 Amalgamated Meatcutters and Butcher
Workman of North America, AFL-CIO.
 Nos. 84-1217, 84-1458 and 85-1501.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 9, 1984.
Re-Submitted April 22, 1985.
Decided March 20, 1986.
 
 Ronald R. Peterson, Chicago, Ill., and Steven A. Weidner, Waterloo, Iowa, for appellants.
 Lorraine C. Davis, Washington, D.C., for appellee.
 Before LAY, Chief Judge, and ROSS and McMILLIAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Rath Packing Company (Rath) appeals and the Equal Employment Opportunity Commission (EEOC) cross-appeals from a final judgment entered in the District Court for the Southern District of Iowa in an action brought pursuant to 42 U.S.C. Sec. 2000e et seq. (1982) (Title VII). The district court found that Rath's subjective hiring practices resulted in discrimination against women and were not justified by business necessity. The district court upheld Rath's no-spouse rule as justified by business necessity. The district court awarded backpay, post-judgment interest and affirmative injunctive relief. EEOC v. Rath Packing Co., No. 77-57-D, slip op. at 7 (S.D.Iowa Feb. 10, 1984).
 
 
 2
 For reversal Rath argues that (1) the action should have been automatically stayed under 11 U.S.C. Sec. 362(a) of the Bankruptcy Act, (2) the district court abused its discretion in denying a stay under 11 U.S.C. Sec. 105 and 28 U.S.C. Sec. 1651, (3) the district court's judgment violated 11 U.S.C. Secs. 362(b)(5), 502(b) and 1129 because the judgment enforces a money judgment and imposes post-judgment interest, (4) the district court erred in finding a lack of business necessity for Rath's hiring practices, and (5) the district court abused its discretion in awarding backpay in light of Rath's precarious financial condition. Rath also appeals a final order entered on March 14, 1985, denying Rath's Fed.R.Civ.P. 60(b) motion.
 
 
 3
 EEOC on cross-appeal argues that the district court erred (1) as a matter of law and fact in concluding that Rath's no-spouse rule was justified by business necessity, (2) in denying retroactive seniority, prejudgment interest, and full costs to EEOC, and (3) in not calculating the class backpay award on the basis of the availability of female workers in the general population of Louisa County, Iowa.
 
 
 4
 For the reasons discussed below, we affirm in part, reverse in part and remand this case for further proceedings consistent with this opinion.
 
 
 5
 Rath, an Iowa corporation, is engaged in the business of slaughtering hogs and processing the meat products obtained from the hogs. Rath has its principal plant in Waterloo, Iowa, and a limited operation in Columbus Junction, Iowa. The Columbus Junction plant, the subject of this litigation, is divided into 12 departments: hog kill, hog cut, loading, sanitation, trim, inedible rendering, yards, smoking, curing, packing, maintenance and miscellaneous gang. More than half of the job classifications at the Columbus Junction plant for the period from September 1, 1970, to August 31, 1979, were in the kill and cut departments. These jobs were considered the least desirable jobs in the plant but were the highest paid.
 
 
 6
 Rath's Columbus Junction facility employed approximately 250 persons; 50% of the employees were related to one another and 95% were male. The population of Columbus Junction is approximately 1500 persons.
 
 
 7
 Stipulated statistics established that 554 persons applied to Rath for employment from January 1, 1973, to February 15, 1978. During this period seven (or 7.39%) of the 95 female applicants (who were not spouses of current employees) were hired. Twenty-six additional female applicants were denied employment because they were spouses of current employees. Information concerning applications filed after February 15, 1978, is not available.
 
 
 8
 The United Food and Commercial Workers,[1] AFL-CIO (formerly Amalgamated Meatcutters and Butchers Workmen of North America), District Local No. 431 (Union), was the exclusive bargaining representative for plant employees at the Columbus Junction plant. The collective bargaining agreements governing the plant required that where possible Rath would promote or transfer from within rather than hire from without. When a vacancy occurred, the vacancy was posted so that employees in that department could bid. If there were no bids, persons in other departments could bid. If no one in another department bid, then the employee with the least seniority in the department where the vacancy occurred was "forced to" the job. If there was no employee to "force to" the job, then a new employee was hired. Rath had no established procedure for giving notice of vacancies to the public.
 
 
 9
 Rath's office manager, Walter McFarland, was responsible for accepting and maintaining applications and selecting applicants for employment. The plant superintendent had the authority to overrule McFarland's choice of applicants but seldom did so. Rath had no written or otherwise established selection guidelines and McFarland was unable to identify what information was deemed significant in evaluating and selecting applicants. McFarland expressly discounted age, height, weight, prior experience, and work history as being critical in the selection of new employees. McFarland, however, stressed the importance of getting the right person for the job because the person could be assigned to any job in the plant.
 
 
 10
 In August 1973 Rath prospectively implemented a no-spouse rule prohibiting the employment of spouses of Rath employees. From approximately 1966 to the time of trial, Rath employed seven married couples at the Columbus Junction plant.
 
 
 11
 EEOC filed this suit in September 1977. The suit was based on a charge filed on December 15, 1975, by Mary Turner, who alleged that Rath unlawfully refused to employ her because of her sex. EEOC alleged in its complaint that Rath refused to hire women at its Columbus Junction plant and that Rath's policy of not hiring spouses of employees excluded a disproportionate number of women from employment. EEOC sought injunctive relief, full backpay with interest, and costs.
 
 
 12
 The action was bifurcated and separate trials on liability and relief were held. After a four day trial in July 1980 on liability, the district court found that Rath discriminated against women in hiring from 1971 forward and that three women who testified at trial established individual claims of disparate treatment. The district court concluded, however, that Rath had shown a business necessity for the no-spouse rule.
 
 
 13
 The case was referred to a special master in 1982 for relief proceedings. In January 1983 Rath closed its Columbus Junction plant.[2] In April of 1983 the trial on relief was held. The special master recommended a class backpay award of $1,015,901, injunctive relief, and retroactive seniority for rejected female applicants. The special master further recommended that prejudgment interest not be granted. No recommendation was made concerning costs because one item of costs was compensation for the services of the special master.
 
 
 14
 After the special master issued his report and recommendations, Rath filed a petition in the bankruptcy court for reorganization under Chapter 11 of the Bankruptcy Act. The district court held that Rath's bankruptcy petition did not automatically stay the Title VII proceedings, In re Rath Packing Co., 37 B.R. 614, 616-17 (S.D.Iowa 1984), and accordingly proceeded to consider the special master's recommendations and to enter final judgment.
 
 
 15
 The district court adopted the special master's recommendations to grant injunctive relief and to deny prejudgment interest. The district court awarded class-based backpay ($1,000,000) and post-judgment interest but denied retroactive seniority. The district court ordered that costs be shared equally between EEOC and Rath.
 
 
 16
 Rath and EEOC subsequently appealed the judgment of the district court. On October 9, 1984, the appeal was argued before this court. In February 1985 Rath filed a Rule 60(b) motion and requested that its appeal before this court be held in abeyance pending a decision on the motion. On February 22, 1985, this court ordered the district court to certify its ruling on the Rule 60(b) motion and ordered that the appeal be held in abeyance. On March 14, 1985, the district court denied Rath's 60(b) motion. On April 22, 1985, the order holding the appeals in abeyance was vacated, and the appeal from the denial of the 60(b) motion was consolidated with the pending appeals.
 
 Automatic Stay Under 11 U.S.C. Sec. 362(a)
 
 17
 Rath argues that the district court erred in refusing to stay those portions of the Title VII proceedings related to backpay, seniority, and interest because Sec. 362(a) provides for an automatic stay of such proceedings. In support of its position, Rath argues that the automatic stay is one of the fundamental debtor protections provided by the Bankruptcy Act and is inapplicable only where a governmental unit sues to protect the public safety and health. Relying on Missouri v. Bankruptcy Court, 647 F.2d 768, 776 (8th Cir.1981), cert. denied, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982), Rath argues that an action brought by EEOC, although a regulatory agency, is stayed by the automatic stay provision because it is primarily directed to making aggrieved persons financially whole.
 
 
 18
 EEOC argues that this action comes within the exception to the automatic stay provision because it is a Title VII action brought to enforce federal laws prohibiting discrimination in the work place. EEOC argues that suits under Title VII are guided by "an overriding public interest in equal employment opportunity asserted through direct federal enforcement." General Telephone Co. v. EEOC, 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980) (citations omitted).
 
 
 19
 Section 362(a)[3] provides that filing a bankruptcy petition operates as an automatic stay of judicial proceedings against the debtor. "The general policy behind this section is to grant complete, immediate, albeit temporary relief to the debtor from creditors, and also to prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected." Penn Terra Ltd. v. Department of Environmental Resources, 733 F.2d 267, 271 (3d Cir.1984) (Penn Terra ). However, actions by a government unit to enforce its police or regulatory powers are exempt from operation of the automatic stay provision under Sec. 362(b)(4).[4] Thus,
 
 
 20
 where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damage for violation of such laws, the action or proceeding is not stayed under the automatic stay.
 
 
 21
 S.Rep. No. 989, 95th Cong., 2nd Sess. 52, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5838; H.Rep. No. 595, 95th Cong., 2nd Sess. 343, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6299.
 
 
 22
 No court has considered whether a suit by EEOC comes within the exception to the automatic stay. Courts have, however, considered whether actions brought by other types of regulatory agencies come within the automatic stay. The Sixth Circuit held that workers' compensation proceedings were not automatically stayed where the benefits were to be paid from an insurance fund or from security bonds which were not part of the debtor's estate. In re Mansfield Tire & Rubber Co., 660 F.2d 1108, 1115 (6th Cir.1981). Proceedings brought under the Fair Labor Standards Act for the assessment of penalties for violation of child labor laws likewise were not stayed by the automatic stay provision. In re Tauscher, 7 B.R. 918, 920 (Bankr.E.D.Wis.1981). The Third Circuit has also held that an action seeking a preliminary injunction to correct violations of the state environmental protection statute was not stayed by the automatic stay provision. Penn Terra, 733 F.2d at 274. Lastly, NLRB proceedings, which are closely analogous to EEOC proceedings, have not been stayed by the automatic stay provision. Ahrens Aircraft, Inc. v. NLRB, 703 F.2d 23, 24 (1st Cir.1983); NLRB v. Evans Plumbing Co., 639 F.2d 291, 293 (5th Cir.1981) (per curiam); In re Bel Air Chateau Hospitals, Inc., 611 F.2d 1248, 1250-51 (9th Cir.1979). Contra In re The Theobald Industries, Inc., 16 B.R. 537, 537 (Bankr.D.N.J.1981).
 
 
 23
 Rath, relying on this court's decision in Missouri v. Bankruptcy Court, 647 F.2d at 776, argues that under the reasoning of this case the EEOC proceeding should have been automatically stayed. We disagree. In Missouri v. Bankruptcy Court, a state regulatory agency attempted in state court to enforce Missouri's grain laws, which enforcement was in direct conflict with the bankruptcy court's orders. This court rejected the state's contention that the police power exception automatically applied because a state agency was involved. Instead we analyzed the purpose underlying the Missouri law and found that although the law might be "regulatory in nature, [it] primarily relate[s] to the protection of pecuniary interest in the debtors' property and not to matters of public safety and health." Id.
 
 
 24
 By contrast, "EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties; it is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination and settling disputes." Occidental Life Insurance Co. v. EEOC, 432 U.S. 355, 368, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977). Thus, "[w]hen the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." General Telephone Co. v. EEOC, 446 U.S. at 326, 100 S.Ct. at 1704. When EEOC sues to enforce Title VII it seeks to stop a harm to the public--invidious employment discrimination which is as detrimental to the welfare of the country as violations of environmental protection and consumer safety laws, which are expressly exempt from the automatic stay. We therefore hold that the automatic stay provision did not apply to this Title VII action brought by EEOC.
 
 Denial of a Discretionary Stay
 
 25
 Rath next argues that the district court abused its discretion in refusing to grant a discretionary stay based on 11 U.S.C. Sec. 105 and 28 U.S.C. Sec. 1651. Rath argues that its assets were diminished by the litigation expenses and therefore a discretionary stay should have been granted. Further, Rath argues that the Columbus Junction plant closed during the pendency of the litigation and no decision had been made at the time of the trial whether it would reopen. Thus, Rath argues the injunctive relief sought was meaningless.
 
 
 26
 EEOC argues that the district court properly denied the discretionary stay because litigation fees do not threaten the estate of the bankrupt. Litigation fees, like other debts incurred by a bankrupt before its reorganization plan is filed or approved, are ultimately settled by the bankruptcy court. EEOC argues that Congress by providing for the exception to the automatic stay implicitly recognized that preservation of the estate of the debtor is not always the primary goal.
 
 
 27
 Section 105[5] gives the bankruptcy court the power to issue orders necessary or appropriate to carry out the provisions of Title 11. The All Writs Act, 28 U.S.C. Sec. 1651,[6] authorizes bankruptcy courts to issue stays. "Stays or injunctions issued under these sections will not be automatic upon the commencement of a case, but will be granted or issued under the usual rules governing the issuance of injunctions." In re Vantage Petroleum Corp., 25 B.R. 471, 476 (Bankr.E.D.N.Y.1982). "[S]tays will be granted only if a party shows a necessity for a stay." In re Bel Air Chateau Hospitals, Inc., 611 F.2d at 1251; see In re Matter of Shippers Interstate Service, Inc., 618 F.2d 9, 13 (7th Cir.1980). These stays by definition are discretionary and this court will overturn the decision of the lower court only if there has been an abuse of discretion.
 
 
 28
 We hold that the district court did not abuse its discretion in denying the request for a stay of the EEOC action. Congress by excepting certain actions from the automatic stay provision recognized that the debtor would likely incur litigation expenses as a result of any excepted lawsuit. Penn Terra, 733 F.2d at 278. Congress has therefore implicitly recognized that litigation expenses alone do not justify a stay of a proceeding. See In re Rath Packing Co., 38 B.R. 552, 562-63 (Bankr.N.D.Iowa 1984) (stay of NLRB proceedings denied).
 
 Entry of Money Judgment
 
 29
 Rath next argues that the district court erred in entering the judgment against Rath because governmental units may not seek to enforce money judgments. Rath, relying on In re Mansfield Tire & Rubber Co., 660 F.2d at 1113, 1115, argues that the scope of the district court's order far exceeds the limited police power exception of 11 U.S.C. Sec. 362(b)(5). Rath argues that the district court order established a payment plan, imposed prejudgment interest, and elevated EEOC to the status of a favored creditor with 100% payment.
 
 
 30
 EEOC argues that the district court judgment does not violate Sec. 362(b)(5). Specifically EEOC argues that Sec. 362(b)(5) only prohibits actions to enforce or execute a money judgment, and the judgment in this case is not self-executing. Relying on Penn Terra, EEOC argues that it is the "seizure of a defendant debtor's property, to satisfy the judgment ... which is proscribed by subsection 362(b)(5)." 733 F.2d at 275. EEOC further asserts that during the pendency of the bankruptcy proceedings it will not file an action against Rath for contempt for failure to pay or otherwise attempt to actually obtain execution of the judgment.
 
 
 31
 Section 362(b)(5)[7] provides that the automatic stay does not apply to enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory powers. The reason for this ban against enforcement of money judgments is to prevent unfairness to a debtor's other creditors.
 
 
 32
 Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.
 
 
 33
 H.Rep. No. 595, 95th Cong., 2nd Sess. 342-43 (1978); reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6299; S.Rep. No. 989, 95th Cong., 2nd Sess. 51-52 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5838.
 
 
 34
 The entry of a judgment for injunctive relief and backpay is permitted under Sec. 362(b)(5), but the actual enforcement of the backpay judgment is not permitted. E.g., NLRB v. Evans Plumbing Co., 639 F.2d at 293; cf. In re Mansfield Tire & Rubber Co., 660 F.2d at 1115 (Industrial Commission of Ohio, Bureau of Workers Compensation, could adjudicate workers' compensation claims against the debtor and could order payment of the claims only because the claims were to be paid either from an insurance fund or surety bonds, neither of which were a part of the debtor's estate).
 
 
 35
 We hold that the district court did not err in entering a money judgment against Rath. The district court, however, went beyond the entry of a money judgment as permitted by Sec. 362(b)(5) and established a detailed payment plan. The judgment of February 10, 1984, not only awarded EEOC the sum of $1,000,000, but required Rath to repay the sum in five equal installments of principal with accrued interest, with the first installment due on February 10, 1985. Failure to meet a required installment results in acceleration of the unpaid balance at the option of EEOC. EEOC was also directed to formulate a plan for disbursement of judgment proceeds and to set up a claims system. This plan went beyond the entry of a money judgment and therefore violated 11 U.S.C. Sec. 362(a).
 
 
 36
 Rath also argues that the establishment of a payment plan violates 11 U.S.C. Sec. 1129.[8] We agree. The bankruptcy court has the responsibility to confirm a reorganization plan and to distribute Rath's assets in accord with this plan. Payment of the EEOC claim, a pre-petition unsecured claim, may not be given preference over the claims of other creditors. Neither EEOC's promise not to collect the judgment nor the possibility that the bankruptcy court will modify the payment plan is sufficient to correct the error.
 
 
 37
 Rath further argues that the imposition of post-judgment interest is contrary to 11 U.S.C. Sec. 502(b) which prohibits the imposition of interest after the date of the bankruptcy filing. We agree that the district court erred in awarding post-judgment interest. Section 502(b)[9] provides that as of the date of the bankruptcy filing, interest will not accrue and any claims for unmatured interest which become due after the filing date shall be disallowed. Nicholas v. United States, 384 U.S. 678, 682, 86 S.Ct. 1674, 1678-79, 16 L.Ed.2d 853 (1966); In re Boston & Maine Corp., 719 F.2d 493, 495 (1st Cir.1983), cert. denied, 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984). The purpose of this rule is stated in Vanston Bond Holders Protective Committee v. Green, 329 U.S. 156, 163-64, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946):
 
 
 38
 Exaction of interest where the power of the debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of a delay in prompt payment--a delay necessitated by law.... The delay in distribution ... is a necessary incident to the settlement of the estate ... it would be inequitable for anyone to gain an advantage or to suffer a loss because of such delay.
 
 Subjective Hiring Practices
 
 39
 Rath next argues that the district court erred in holding that there was no business necessity for Rath's subjective hiring practices. Rath had no established criteria for selecting employees. Rath argues that the positions, although unskilled in nature, require certain objective skills and experience because an employee might be forced to perform any job in the plant. Rath also argues that it should not be required to adopt what the court perceives to be the best hiring procedures rather than those which Rath has developed based on its experience. Lastly, Rath argues that the district court did not distinguish between the strict test of a bona fide occupational requirement and the less strict test of a valid business reason.[10]
 
 
 40
 EEOC argues that the district court's finding is supported by the overwhelming weight of the evidence and therefore is not clearly erroneous. EEOC argues that McFarland, the Rath official primarily responsible for hiring at Rath, was unable to articulate any particular qualifications or attributes he looked for in an applicant. EEOC also argues that Rath failed to establish that the subjective hiring procedures were necessary or essential and that there were no alternative practices with less discriminatory effect.
 
 
 41
 "[A]n employment practice which has a disparate impact on a group protected under Title VII is invalid unless the employer can prove the challenged practice is justified by a business necessity." Kirby v. Colony Furniture Co., 613 F.2d 696, 703 (8th Cir.1980). " 'The touchstone is business necessity and the practice must be shown to be necessary to safe and efficient job performance....' " Id. (citations omitted). "The system in question must not only foster safety and efficiency, but must be essential to that goal." United States v. St. Louis-San Francisco R.R., 464 F.2d 301, 308 (8th Cir.1972) (emphasis added), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973). A business practice may not be justified on the basis of business necessity if there exists a "nondiscriminatory alternative means of determining qualification." Id. at 309; see Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977).
 
 
 42
 We hold that the district court did not err in holding that Rath's subjective hiring practices were not justified by business necessity. The undisputed evidence established that Rath's subjective hiring practices had a disparate impact on women. Ninety-five percent of Rath's employees were men. After EEOC established the disparate impact of the subjective hiring practices, Rath had the burden of producing evidence of business necessity and the burden of persuasion on that issue. Rath was unable to identify the criteria and qualifications which were considered in the hiring decisions. It follows therefore that Rath could not establish that these qualifications and criteria were necessary to the safety and efficiency of its operations. Rath's hiring practices, even if intended to select the best qualified person, were highly susceptible to abuse. While some subjectivity is inevitable in the hiring process, the total lack of objective criteria at Rath "could only reinforce the prejudices, unconscious or not, which Congress in Title VII sought to eradicate as a basis for employment." Stewart v. General Motors Corp., 542 F.2d 445, 451 (7th Cir.1976), cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). " '[S]ex is the sole identifiable factor explaining the divergence in numbers of men and women selected by Rath during the relevant time frame.' " EEOC v. Rath Packing Co., No. 77-57-D, slip op. at 6 (liability order of April 22, 1981) (citation omitted).
 
 Backpay Award
 
 43
 Rath next argues that the district court erred in awarding backpay. In support of this position, Rath argues that the district court failed to make findings concerning Rath's ability to pay or to articulate reasons for its decision. Rath also argues that the district court failed to consider the number of victims and the number of nonvictims affected and the economic circumstances of the industry.
 
 
 44
 Rath argues that it has experienced "horrendous losses" since 1977[11] and therefore does not have the ability to pay the award out of current resources, either borrowed or owned. Rath argues that the employees, the majority owners of the company, are the only ones who can provide funds to satisfy such an award and they have already made many financial sacrifices for the company.
 
 
 45
 Rath urges this court to review this issue because the issue is based almost entirely on the written record and not upon the testimony of witnesses. Lastly, Rath argues that it may have no forum to have this issue reviewed if this court does not review it because EEOC will argue in the bankruptcy court that the issue is "res judicata" and, secondly, the bankruptcy court may believe that it does not have the authority to modify the district court's order.
 
 
 46
 EEOC argues that the district court did not abuse its discretion in awarding backpay. EEOC argues that persons who have been denied employment because of discrimination are entitled under Title VII to backpay and backpay is to be denied only in extraordinary circumstances.
 
 
 47
 "The district court is obligated to grant a plaintiff who has been discriminated against ... the most complete relief possible." Briseno v. Central Technical Community College Area, 739 F.2d 344, 347 (8th Cir.1984); see Franks v. Bowman Transportation Co., 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). There is a strong presumption that persons who have been discriminated against are entitled under Title VII to backpay; this presumption can only be overcome "for reasons, which if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injury suffered through past discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). "[S]pecial factors which justify not giving an award of class wide backpay have been narrowly construed," Kirby v. Colony Furniture Co., 613 F.2d at 699; see Wells v. Meyer's Bakery, 561 F.2d 1268, 1272 (8th Cir.1977), and usually include circumstances where state legislation is in conflict with Title VII. Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 260 (5th Cir.1974) (banc).
 
 
 48
 We consider first Rath's argument that the district court was required to state its reasons in support of the award of backpay. Rath cites two district court cases for the proposition that a district court must state reasons for an award of backpay. Ingram v. Madison Square Garden Center, 482 F.Supp. 918, 921 (S.D.N.Y.1979); Rios v. Enterprise Ass'n of Steamfitters Local 638, 400 F.Supp. 988, 991 (S.D.N.Y.1975). Rath also attempts to argue by analogy from other cases which state that a district court must identify the factors which justify the denial of backpay. The rationale, however, underlying the requirement for a statement of reasons for a denial of backpay does not exist where a district court grants backpay. A presumption exists in favor of backpay; backpay may be denied only if there are compelling reasons justifying the denial. Consequently, the district court is required to state reasons for the denial in order that a reviewing court may determine if compelling reasons exist. We hold that the district court did not err in failing to identify those specific factors it considered in awarding backpay.
 
 
 49
 Rath next argues that the district court did not consider Rath's ability to pay prior to granting backpay. The record does not support Rath's assertion. The special master considered at length Rath's financial condition. The special master found that the factors militating against an award of backpay--(1) Rath's "precarious financial status and ongoing losses," (2) 60% of the shareholders are employees, and (3) Rath's stated inability to liquidate an award without further employee concessions--were not of sufficient weight or so exceptional that they overcame the presumption that backpay is one of the consequences of Title VII violations.
 
 
 50
 The district court approved and adopted the report and recommendation of the special master except as modified. The district court did not modify the special master's findings or recommendation on backpay except to round the backpay award off to $1,000,000. Further, the district court specifically considered and overruled Rath's objection to the special master's recommendation for backpay. EEOC v. Rath Packing Co., No. 77-57-D, slip op. at 7 (order of Feb. 10, 1984). Rath challenged the recommendation on the grounds that Rath was unable to pay the award and the award would have an adverse effect on the employees at the Columbus Junction plant. In response to this objection, the district court did not indicate that Rath's financial condition was not considered in making the backpay award. Rather, the district court expressly recognized that "[t]he effect of this backpay award can now be taken into consideration by the bankruptcy court." Id. at 3. The district court in the same order expressly considered Rath's financial condition in awarding post-judgment interest. Id. at 7. The district court denied prejudgment interest because of Rath's "precarious financial condition" and ordered installment payments of the award for the same reason. Id.
 
 
 51
 We hold that the district court did not abuse its discretion in awarding backpay. Victims of employment discrimination are entitled to "make-whole" relief, which includes backpay. Backpay should not be denied simply because the employer, who has wronged the victims, will be adversely affected by the backpay award. See Frank v. Bowman Transportation Co., 424 U.S. at 774, 96 S.Ct. at 1269. The impact of the award on Rath's employees, who are also the majority stockholders, is an insufficient reason to deny backpay. These employees were aware of this litigation, which commenced in 1977, when they purchased their stock in 1983. In addition they received benefits from the purchase of the stock--the continuation of their employment and compensation. See In re Rath Packing Co., 36 B.R. 979, 981 (Bankr.N.D.Iowa 1984). It is not inequitable that the employees-shareholders, having received the benefits of ownership, should share the detriment resulting from the backpay award.
 
 Denial of Rule 60(b) Motion
 
 52
 The district court denied Rath's Fed.R.Civ.P. 60(b) motion on the basis that the evidence offered by Rath did not constitute newly discovered evidence and "for other reasons expressed in [EEOC's] response to defendant's motion." The district court found that the evidence tendered as newly discovered evidence was formulated after the trial.
 
 
 53
 Rath argues that the district court abused its discretion in denying its motion. Rath submitted a report concerning its hiring procedures upon reopening its Columbus Junction facility in July 1984. The report covered the four months from the time the Columbus Junction facility opened in July 1984 to October 1984, when it closed again. Rath claims that the report reflects the actual level of interest of women in employment at Rath and the actual employment experience of women who accepted employment at Rath during this period.
 
 
 54
 EEOC argues that the motion was not filed within a reasonable time as required by the rule. The motion was filed seven months after the entry of judgment. EEOC also argues that the evidence was not newly discovered evidence because it was formulated after the trial and concerned only post-trial events, that is, Rath's hiring practices and experience after the trial. EEOC further argues that the evidence is neither probative of nor relevant to the issue of Rath's liability.
 
 
 55
 In order to obtain relief under Fed.R.Civ.P. 60(b)(2) on grounds of newly discovered evidence, the moving party must establish that (1) evidence was discovered after trial, (2) it exercised diligence to obtain the evidence before trial, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, and (5) the evidence is such that a new trial probably would produce a new verdict. Rosebud Sioux Tribe v. A. & P. Steel, Inc., 733 F.2d 509, 515 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). The district court's ruling on a motion for relief from judgment will be disturbed on appeal only if the district court abused its discretion. Pioneer Insurance Co. v. Gelt, 558 F.2d 1303, 1312 (8th Cir.1977).
 
 
 56
 We hold that the district court did not abuse its discretion in denying Rath's motion. The report of Rath's hiring practices and experience for the period of July through October 1984 was not evidence which was in existence at the time of the trial but was evidence which was formulated after the trial. Further evidence of Rath's hiring practices and experience after the trial is not relevant to the issue of Rath's liability prior to trial.
 
 No-Spouse Rule (Cross-appeal)
 
 57
 EEOC on cross-appeal argues that the district court erred as a matter of law and fact in holding that Rath's no-spouse rule was justified by business necessity. EEOC argues that the district court, although articulating the proper legal standard, in fact imposed a lighter burden on Rath than required by the law of this circuit. EEOC further argues that this finding is contrary to the record evidence and inconsistent with the district court's subsidiary findings.
 
 
 58
 The district court stated that "the issue the court must address is ... whether management's response to perceived production problems ... was reasonable ... and designed to improve conditions in the plant." EEOC v. Rath Packing Co., slip op. at 23 (order of Apr. 22, 1981) (emphasis added). The district court found that Rath was "unable to statistically corroborate its contention that production was adversely affected through the hiring of spouses." Id. The district court nonetheless ultimately concluded that Rath had demonstrated "an acceptable business-related basis for the rule," id. at 24, and that the "anti-spousal policy was enacted to achieve the interrelated business objectives of optimum production and employee performance." Id. at 20.
 
 
 59
 Rath urges this court to depart from its strict test of business necessity and to follow the less demanding standard applied by the Seventh Circuit in Yuhas v. Libbey-Owens-Ford Co., 562 F.2d 496 (7th Cir.1977) (Yuhas ), cert. denied, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978), and by the district court in this case. Rath argues that the court in Yuhas correctly recognized that spousal relationships in the workplace create situations which are problematic for the employer and employees--problems of efficiency, productivity and ease of management. Rath argues that its no-spouse rule was directed at problems which had occurred when married couples worked at Rath; these problems were dual absenteeism, vacation scheduling, supervision, and employee pressure to hire spouses.
 
 
 60
 As we have previously stated, Title VII forbids the use of a facially neutral employment standard which disproportionately excludes a protected class from employment unless the employer shows that the standard is justified by business necessity. "[T]he employer must meet 'the burden of showing that any given requirement [has] ... a manifest relationship to the employment in question.' " Dothard v. Rawlinson, 433 U.S. at 329, 97 S.Ct. at 2727, citing Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971).
 
 
 61
 [T]he proper standard for determining whether "business necessity" justifies a result which has a ... discriminatory result is not whether it is justified by routine business considerations but whether there is a compelling need for the employer to maintain that practice and whether the employer can prove there is no alternative to the challenged practice.
 
 
 62
 Kirby v. Colony Furniture Co., 613 F.2d at 705 n. 6 (emphasis in original); see Gilbert v. City of Little Rock, 722 F.2d 1390, 1395 (8th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984).
 
 
 63
 We hold that the district court applied the wrong legal standard in determining whether the no-spouse rule was justified by business necessity. The district court did not consider whether there was a compelling need for the no-spouse rule.[12] In order for Rath to prevail, the problem to be addressed by the no-spouse rule must be concrete and demonstrable, not just "perceived"; and the rule must be essential to eliminating the problem, not simply reasonable or designed to improve conditions. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 248 (10th Cir.1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971).
 
 
 64
 Application of the proper legal standard to the district court's factual findings compels the conclusion that Rath failed to demonstrate that the no-spouse rule was justified by business necessity. Rath asserted that dual absenteeism was a problem when both spouses worked for Rath. The district court found, however, that from March 3, 1975, to May 31, 1978, "spouses exhibited a lower absentee rate than did non-spouses." EEOC v. Rath Packing Co., slip op. at 21 (order of Apr. 21, 1981). The district court noted that Rath was able to point to only one incident of habitual dual absenteeism. The district court further found that production records between 1975 and 1978 revealed that "daily production was not detrimentally affected by the minimal dual spouse absenteeism during this period." Id. The district court nonetheless held that "management's perception in 1973 of a disruptive effect upon plant operations ... [was] rationally predicated upon sound business interests." Id.
 
 
 65
 Secondly, Rath asserted that the presence of both spouses in the work force caused problems in scheduling vacations. The district court found that "the two most serious difficulties connected to spousal selection of vacation time were corrected when the company prohibited trading [of vacation time] in 1970 and initiated a policy in 1973 requiring all employees to indicate in the order of seniority their preference when canvassing is undertaken." Id. at 22. These two rules eliminated the vacation problems which had an impact on the efficiency of Rath's production.
 
 
 66
 The district court, however, felt that the actual scheduling of vacations was not the only factor to be considered, but that employee morale was crucial in the business necessity analysis of the problem. The district court found that "spouses remained dissatisfied with the present procedure" and that disgruntled fellow workers often applied for vacation times sought by a less senior spousal employee in order to prevent a couple from securing a joint vacation. Id. The district court, however, did not require Rath to demonstrate how staff morale affected the safety or efficiency of Rath's operation. Staff discontent and reduced staff morale as a result of the scheduling of spouses' vacations may not be the basis for the no-spouse rule unless these problems affect the safety and efficiency of Rath's operation.
 
 
 67
 Rath next asserts that the no-spouse rule was required in order to avoid problems associated with an employee's supervision of his or her spouse. Rath cited one instance where spousal supervision resulted in complaints of favoritism to and harassment of the supervised spouse. It is not sufficient that the rule be business-related; the rule must be essential to safety and efficiency. Jones v. Lee Way Motor Freight, Inc., 431 F.2d at 249. There must be no other available nondiscriminatory alternative to accomplish the legitimate business purpose. Dothard v. Rawlinson, 433 U.S. at 329, 97 S.Ct. at 2726-27. In this case a nondiscriminatory alternative existed. The collective bargaining agreement permitted an employee to bid out of a position where the employee would be supervised by a spouse. Rath also could have negotiated for the right to assign employees so that they would not be supervised by spouses.
 
 
 68
 The last reason asserted by Rath for the no-spouse rule is employee pressure to hire spouses. Rath failed to demonstrate how this pressure resulted in lower production or decreased safety. Nor was there any showing by Rath that the pressure could not have been alleviated by a rule which did not have a discriminatory impact.
 
 
 69
 In summary, we hold that Rath failed to establish a business necessity for the no-spouse rule. Rath failed to show that the problems that Rath experienced in employing spouses had any demonstrable effect on safety and efficiency. Workers' morale, which Rath and the district court deemed crucial to the business necessity analysis, cannot justify implementing a discriminatory policy where the claimed dissatisfaction has not been shown to have resulted in reduced productivity, decreased job efficiency, or more dangerous working conditions.
 
 
 70
 We note further that Rath's reliance on Yuhas is misplaced. The Seventh Circuit in Yuhas upheld a no-spouse rule although the employer was unable to demonstrate that employment of spouses affected efficiency or safety. The court held that "[b]ecause the no-spouse rule plausibly improves the work environment, and because it does not penalize women on the basis of their environmental or genetic background," the rule was job related and did not violate Title VII. 562 F.2d at 500. The court stated however that its decision might have been different "if plaintiffs had shown that defendant historically employed more men than women ... because it intentionally discriminated against women. [The court assumed] that the present disparity between men and women ... was the result of noninvidious factors." Id. The standard articulated in Yuhas therefore would not be applicable to this case because the district court found Rath intentionally discriminated against women. This intentional discrimination against women resulted in Rath's employees being overwhelmingly male.
 
 
 71
 Denial of Prejudgment Interest (Cross-appeal)
 
 
 72
 EEOC argues that the district court erred in denying prejudgment interest because prejudgment interest, like backpay, is appropriate in order to promote the make-whole purpose of Title VII. EEOC further argues that the district court's decision, although discretionary, should be set aside because it was based on erroneous beliefs and an improper understanding of the law.
 
 
 73
 Rath argues that the district court did not abuse its discretion in denying prejudgment interest because there is no presumption in favor of prejudgment interest and interest should be denied where its exaction would be inequitable. Rath further argues that the district court's decision may only be set aside if there is no evidence in the record to support the district court's decision.
 
 
 74
 "Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from the inherent delays of litigation." General Facilities v. National Marine Service, 664 F.2d 672, 674 (8th Cir.1981); see Behlar v. Smith, 719 F.2d 950, 954 (8th Cir.1983) The decision to award or deny prejudgment interest will be upheld unless the district court abuses its discretion. Earnhardt v. Puerto Rico, 744 F.2d 1, 3 (1st Cir.1984).
 
 
 75
 The district court in this case denied prejudgment interest because of Rath's precarious financial situation. The district court also found that (1) the interest rates which EEOC requested were rates which no member of the plaintiff class could reasonably have obtained had she possessed the funds, (2) the delay in determining Rath's backpay liability made an assessment of prejudgment interest inequitable and (3) an award of prejudgment interest would have required additional sacrifices by Rath employees. Report and Recommendation of Special Master, Sept. 30, 1983, at 41-43.
 
 
 76
 We hold that the district court did not abuse its discretion in denying prejudgment interest. The district court properly weighed the interest of the victims in make-whole relief against the financial impact of a prejudgment interest award in excess of one million dollars on Rath and its owner-employees.[13] The delay (although the fault of neither party) and the uncertainty in determining Rath's backpay liability, on which the interest is to be calculated, were also proper factors for the district court to consider. Heiar v. Crawford County, 746 F.2d 1190, 1201 (7th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985). We may not substitute our judgment for that of the district court in reconciling these competing interest.[14] Domingo v. New England Fish Co., 727 F.2d 1429, 1446, (9th Cir.) modified on other grounds, 742 F.2d 520 (1984).
 
 
 77
 Denial of Retroactive Seniority (Cross-appeal)
 
 
 78
 The district court denied retroactive seniority because the "complexity of the problems accompanying retroactive seniority counsel against this particular remedy." The district court rejected the special master's finding that the problems envisioned by Rath--a delay in maximum productivity until training is completed and an undefined effect on the relationship of the workers--did not overcome the presumption in favor of retroactive seniority.
 
 
 79
 EEOC argues that the district court erred in denying retroactive seniority. Further, EEOC argues that diminution of seniority expectations of incumbent employees is clearly a usual and foreseeable impact of hiring claimants and giving them seniority. EEOC argues that this is not the type of unusual adverse impact contemplated by Franks v. Bowman Transportation Co., 424 U.S. at 774-75, 96 S.Ct. at 1269, justifying a denial of seniority.
 
 
 80
 Rath argues that the district court did not err because retroactive seniority would result in bumping of long time employees to less desirable jobs, increase the pressure and strain on employees, lower employee morale, and create labor management problems.
 
 
 81
 In Franks v. Bowman Transportation Co., the Supreme Court, in discussing retroactive seniority in Title VII cases, stated:
 
 
 82
 [I]n exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful-place seniority relief, and proceed with further legal analysis from that point; and ... such relief may not be denied on the abstract basis of adverse impact upon interests of otheremployees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases.
 
 
 83
 Id. at 779 n. 41, 96 S.Ct. at 1271 n. 41 (citation omitted).
 
 
 84
 The Court further stated: "We find untenable the conclusion that this form of relief may be denied merely because the interest of other employees may thereby be affected." Id. at 774-76, 96 S.Ct. at 1269-70. " 'Adequate protection of ... rights under Title VII may necessitate ... some adjustment of the rights of [non-victim] employees. The Court must be free to deal equitably with conflicting interests of [non-victim] employees in order to shape remedies that will most effectively protect and address the rights of the ... victims of discrimination.' " Id. at 775-76 n. 35, 96 S.Ct. at 1269 n. 35 (citation omitted). Factors "such as the number of victims, the number of non-victim employees affected and the alternatives available to them and the economic circumstances of the industry," International Brotherhood of Teamsters v. United States, 431 U.S. 324, 376 n. 62, 97 S.Ct. 1843, 1875 n. 62, 52 L.Ed.2d 396 (1977) (citation omitted), should be considered by the district court in determining whether to grant retroactive seniority.
 
 
 85
 In striking this equitable balance between the interests of the victims of discrimination and incumbent employees, courts have primarily been concerned that retroactive seniority relief not result in the discharge of "innocent" incumbent employees. In Romasanta v. United Airlines, Inc., 717 F.2d 1140, 1147-56 (7th Cir.1983), the Seventh Circuit denied competitive retroactive seniority to a class of 1400 former employees. The court found that an award of competitive retroactive seniority would result in the discharge of hundreds of incumbent employees because there was a low attrition rate and a low growth rate in the company. Id.
 
 
 86
 The Ninth Circuit in Moore v. City of San Jose, 615 F.2d 1265 (9th Cir.1980), stated that some effects on incumbent employees are justified to achieve the goals of Title VII. Id. at 1271. The court further stated that the burden is on the employer to demonstrate some unusual adverse impact which would justify the denial of retroactive seniority. Id. The court noted that the award of retroactive seniority would not result in the discharge of incumbent employees and further that the small number of victims would not affect the seniority-based benefits of incumbent employees.
 
 
 87
 This court in Briseno v. Central Technical Community College Area, 739 F.2d at 348, held that the relief granted a Title VII plaintiff may be limited so that innocent employees will not be displaced. This court nonetheless recognized that a plaintiff is entitled to be placed in a comparable position with his or her seniority and other rights to be determined as of the date he or she was denied employment. Where no vacancy exists, the plaintiff is entitled to receive monthly payments equal to the difference between what plaintiff would receive in a comparable position and what the plaintiff earned in mitigation of damages. These payments should continue until the plaintiff is hired by the employer. Id.
 
 
 88
 In the instant case, Rath did not allege nor did the district court find that the grant of retroactive seniority would result in the discharge of employees. Rath asserted that the imposition of retroactive seniority would result in the bumping of long time employees to less desirable jobs, lower employee morale, labor-management problems, and pressure and strain on employees. These consequences can be expected in almost all Title VII cases. Retroactive seniority, therefore, could never be imposed if such factors are sufficient to justify the denial of retroactive seniority.
 
 
 89
 We hold that the district court abused its discretion in denying retroactive seniority. Imposition of retroactive seniority is required in the present case in order to make the identified victims of the discrimination whole, and the district court offers no compelling reason for the denial of retroactive seniority.Labor Force Statistics (Cross-appeal)
 
 
 90
 EEOC argues that the district court erred in refusing to use general population statistics to determine the number of women Rath would have hired absent discrimination and in determining the number of persons entitled to backpay. The district court used applicant flow data. EEOC argues that the qualifications for the positions at Rath are those which the general population possesses or can readily acquire. EEOC further argues that the number of women workers in the categories of nonfarm laborers and operatives in nondurable goods manufacturing and the number of women in Rath's applicant pool were depressed because of Rath's discrimination. EEOC argues that there was overwhelming evidence that women, in greater numbers than represented in these groups, were interested in employment at Rath because the pay was good and the plant was close to their homes.
 
 
 91
 Rath argues that the district court correctly required EEOC to define the available qualified work force in terms of those in the county who would actually be interested in jobs at Rath. Rath also argues that the applicant flow data is the best indicator of the extent of an employer's discrimination.
 
 
 92
 The district court in its opinion on liability found that "general population or civilian work force data" was appropriate to determine whether Rath discriminated against women and the number of persons affected by the discrimination because "entry level or unskilled positions was an issue and the necessary qualifications are those that many people possess or can readily acquire." EEOC v. Rath Packing Co., slip op at 6 (order of Apr. 22, 1981). In its later clarification order of December 1982, the district court held, however, that "general work force statistics have no probative value in determining whether [Rath's] ... hiring practices adversely impacted against females." The district court reasoned that many persons engaged in jobs in nonmanufacturing industries would not be interested in employment at Rath because of the nature of the work. The district court held that the general work force statistics should not be used because in these statistics the number of women in nonmanufacturing industries was not separated from the number of women in nondurable goods manufacturing. The district court therefore relied on Rath's applicant flow data in determining liability and backpay.
 
 
 93
 A comparison of general population statistics with an employer's relevant work force is generally appropriate where the jobs in question do not require special qualifications. Hazelwood School District v. United States, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977); International Brotherhood of Teamsters v. United States, 431 U.S. at 339-40 n. 20, 97 S.Ct. at 1856-57 n. 20; EEOC v. Radiator Specialty, 610 F.2d 178, 184 (4th Cir.1979). The burden is on the defendant to establish that the positions in question require special qualifications which are not possessed or readily acquired by the general population. EEOC v. Radiator Specialty, 610 F.2d at 184. The district court, however, is afforded a great deal of discretion in determining the relevant labor market. Markey v. Tenneco Oil Co., 635 F.2d 497, 499 (5th Cir.1981).
 
 
 94
 Rath failed to establish that the positions in question required special qualifications not possessed or readily acquired by the general population. As previously discussed, Rath could not identify any criteria it used in selecting employees or any common qualifications or skills that its employees possessed. Thus general population statistics were appropriate in determining the extent of Rath's discrimination against women and the amount of backpay. Hazelwood School District v. United States, 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13; Kinsey v. First Regional Securities, Inc., 557 F.2d 830, 839 (D.C.Cir.1977); Kaplan v. International Alliance of Theatrical & Stage Employees, 525 F.2d 1354, 1358 (9th Cir.1975); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir.1970).
 
 
 95
 We hold that the district court erred in finding that the percentage of women employed in the nondurable goods manufacturing category was the appropriate population base because only these women would be interested in jobs at Rath. This finding rests on a faulty premise, that female representation in this category is a true indicator of women's interest in positions at Rath. The district court failed to consider the impact that Rath's discriminatory practices had on the size of this group. In 1978, 230 or approximately 45 percent of the women in the nondurable goods manufacturing category were employed by Rath. Rath's refusal to hire women, therefore, kept the number of women workers in this category lower than it would have been absent discrimination. If this category is used rather than general work force statistics in determining Rath's liability, Rath would benefit from its prior wrongful discrimination.
 
 
 96
 The use of Rath's applicant flow data is likewise inappropriate for the same reasons. Although applicant flow data is often the best indicator of the extent of an employer's discrimination, this is not the case where persons have been deterred from applying because of the employer's discriminatory practices.
 
 
 97
 The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who are expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.... The ... message can be communicated by [the employer's] consistent discriminatory treatment of actual applicants ... and even by the ... composition ... of [the] work force....
 
 
 98
 International Brotherhood of Teamsters v. United States, 431 U.S. at 365, 97 S.Ct. at 1870.
 
 
 99
 This court has also recognized that "[t]he application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." Donnell v. General Motors Corp., 576 F.2d 1292, 1299 (8th Cir.1978) citing Dothard v. Rawlinson, 433 U.S. at 330, 97 S.Ct. at 2727, cert. denied, 459 U.S. 844, 103 S.Ct. 97, 74 L.Ed.2d 88 (1982).
 
 
 100
 In this case Rath's discriminatory practices deterred women from applying for employment. See Donnell v. General Motors Corp., 576 F.2d at 1298. Rath was one of a few large employers in a small community of 1500 and its employment record was known in the community. There was uncontradicted testimony that women did not believe they would be hired at Rath. This perception was consistent with Rath's hiring practices. Only seven of the 95 women who applied from 1973-78 were hired; 157 of the 433 male applicants were hired. Ninety-five percent of Rath's work force was male. The use of Rath's applicant flow data to determine Rath's liability would not give an accurate picture of the number of women affected by Rath's discrimination.
 
 
 101
 On remand, the district court should utilize general work force statistics to determine Rath's liability and to compute the backpay award. The district court must also afford nonapplicants the opportunity to prove that they were deterred from applying by Rath's discriminatory practices. This is not an easy burden for the nonapplicant. International Brotherhood of Teamsters v. United States, 431 U.S. at 367-68, 97 S.Ct. at 1870-71.
 
 
 102
 Inasmuch as the purpose of the nonapplicant's burden of proof will be to establish that [her] status is similar to that of the applicant, [she] must bear the burden of coming forward with the basic information about [her] qualifications that [she] would have presented in an application.... [T]he burden then will be on the employer to show that the nonapplicant was nevertheless not a victim of discrimination.
 
 
 103
 Id. at 369 n. 53, 97 S.Ct. at 1872 n. 53.
 
 Costs (Cross-appeal)
 
 104
 EEOC argues that the district court abused its discretion in allocating 50 percent of the costs to each party. Rath argues that both parties were partially successful and therefore the district court was correct in allocating the costs equally.
 
 
 105
 Fed.R.Civ.P. 54(d) provides that costs are to be allowed as a matter of course to the prevailing party unless the court otherwise directs. "A party who has obtained some relief usually will be considered the 'prevailing party' ... even if it has not succeeded on all of its claims." Superturf, Inc. v. Monsanto Co., 660 F.2d 1275, 1287 (8th Cir.1981); see Coyne Delany Co. v. Capital Development Board, 717 F.2d 385, 390 (7th Cir.1983). " '[T]he prevailing party is prima facie entitled to costs and it is incumbent upon the losing party to overcome that presumption ... [because] denial of costs is in the nature of a penalty for some defection ... in the course of the litigation.' " Walters v. Roadway Express, Inc., 557 F.2d 521, 526 (5th Cir.1977) (citation omitted); see Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1 (7th Cir.1949), cert. denied, 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950).
 
 
 106
 EEOC is clearly the prevailing party in this lawsuit. EEOC was successful in the district court on two of its three claims: the disparate impact claim based on subjective hiring procedures and the disparate treatment claims. Our reversal of the district court on the third claim based on the no-spouse rule means that EEOC succeeded on all three claims. Neither Rath nor the district court identified any misconduct by EEOC which would warrant a denial of costs. Chicago Sugar Co. v. American Sugar Refinery Co., 176 F.2d at 11. We therefore hold that EEOC should be awarded full costs. We need not decide whether the district court's order equally dividing costs based on EEOC's partial success at the trial level was an abuse of discretion.
 
 
 107
 Accordingly, the judgment of the district court is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion.
 
 
 108
 ROSS, Circuit Judge, concurring in part and dissenting in part.
 
 
 109
 I must respectfully disagree with the majority's view that the district judge abused his discretion in declining to award retroactive competitive seniority to the EEOC. Moreover, I do not think the district judge erred in his definition of the relevant available labor pool for purposes of determining liability and computing backpay. In all other respects, I concur in the majority's opinion.
 
 Denial of Retroactive Seniority
 
 110
 I do not agree that the district judge abused his discretion in denying retroactive competitive seniority. "[T]he statutory scheme of Title VII 'implicitly recognizes that there may be cases calling for one remedy but not another, and * * * these choices are, of course, left in the first instance to the district courts." Franks v. Bowman Transportation Co., 424 U.S. 747, 779, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444 (1976).
 
 
 111
 As the majority notes, Rath's opposition to full retroactive seniority is based among other concerns on the prospect that long-term employees will be bumped to less desirable jobs. We recognized in Briseno v. Central Technical Community College Area, 739 F.2d 344, 348 (8th Cir.1984), cited by the majority, that the choice of remedies discussed in Franks permits a district court to limit relief so that innocent incumbent employees will not be displaced. In Moore v. City of San Jose, 615 F.2d 1265, 1272 (9th Cir.1980), also cited by the majority, the Ninth Circuit noted that retroactive seniority in the circumstances of that case would cause no existing employees to lose their jobs, and "the number of returning employees was small enough that their impact on the seniority-based benefits of incumbent employees would be minimal."Thus, while I am not opposed to an award of noncompetitive "benefit" seniority[1] to appropriately identified victims of Rath's discriminatory policies, I would affirm the district court's denial of competitive seniority in this case. In light of the number of persons now rightfully entitled to a place in Rath's work force as the result of the company's years of discriminatory hiring, as well as Rath's current financial status and the certainty that incumbents will be bumped to lower positions, I consider the district court's adjustment of the remedy to account for incumbent employees appropriate. The retention of a full work force by a company which has experienced "horrendous losses" since 1977 and which is presently in bankruptcy seems to me exceedingly unlikely. See Romasanta v. United Air Lines, Inc., 717 F.2d 1140, 1147-56 (7th Cir.1983), cert. denied, 466 U.S. 944, 104 S.Ct. 1928, 80 L.Ed.2d 474 (1984) (declining to award full, retroactive competitive seniority in light of the adverse impact on a substantial number of incumbent employees and certain economic conditions adversely affecting the defendant company's potential for growth).
 
 Labor Force Statistics
 
 112
 In Green v. Missouri Pacific Railroad Co., 523 F.2d 1290, 1293-94 (8th Cir.1975), we recognized that generally three kinds of statistical comparisons may be used to establish whether a challenged employment practice has a disproportionate impact on a protected group in violation of Title VII. Two of these procedures involve resort to general population figures. The first examines whether "[women] as a class (or at least [women] in a specified geographical area) are excluded by the employment practice in question at a substantially higher rate than [men]." Id. at 1293. Another involves comparing the composition of the employer's work force with the composition of the population at large. Id. at 1294. The procedure which does not rely on general population data and which the district court used "focuses on a comparison of the percentage of [male and female] job applicants actually excluded by the employment practice * * *." Id.
 
 
 113
 The district court considered the EEOC's evidence in support of its reliance on general population statistics defective:
 
 
 114
 While the Court believes that general population or similar work force data may be appropriate under certain circumstances, the Court is of the opinion that the failure to break the work force statistics for Louisia [sic] County into the job categories of "durable goods manufacturing" or "non-manufacturing" industries, eliminates any substantive probative value the statistics on the general population may have had. Because of the nature of the jobs offered by the Rath plant, the Court is of the opinion that many persons engaged in jobs in non-manufacturing industries would not be attracted to that type of work, although it may also be questionable whether this type of work would be attractive to many in the durable goods manufacturing. Such statistics would have had more validity than the general population figures.
 
 
 115
 I agree with the district court's analysis. I cannot accept the unsubstantiated premise advanced by the EEOC that the entire female component of the Louisa County, Iowa work force would have been interested in or qualified to perform the hog slaughtering and processing jobs at Rath. See New York City Transit Authority v. Beazer, 440 U.S. 568, 586 n. 29, 99 S.Ct. 1355, 1366 n. 29, 59 L.Ed.2d 587 (1979):Although "a statistical showing of disproportionate impact [need not] always be based on an analysis of the characteristics of actual applicants," Dothard v. Rawlinson, 433 U.S. 321, 330, [97 S.Ct. 2720, 2727, 53 L.Ed.2d 786], "evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants" undermines the significance of such [general population] figures. Teamsters v. United States, supra, at 340 n. 20 [97 S.Ct. at 1856-57 n. 20].
 
 
 116
 I therefore consider the district court's use of applicant flow data appropriate.
 
 
 
 [1]
 The Amalgamated Meat Cutters and Butchers Workmen of North America, District Local 431, AFL-CIO, was designated as a defendant in the complaint pursuant to Fed.R.Civ.P. 19(a)(2). The district court on September 12, 1979, granted the Union's motion for a partial summary judgment on the issue of liability. The Union was required to participate in a subsequent hearing on relief
 
 
 [2]
 The Columbus Junction plant was closed in June 1978, reopened in September 1979, closed again in January 1983, reopened in July 1984, and closed in October 1984
 
 
 [3]
 11 U.S.C. Sec. 362(a) provides:
 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of--
 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
 (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
 (3) any act to obtain possession of property of the estate or of property from the estate;
 (4) any act to create, perfect, or enforce any lien against property of the estate;
 (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
 (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
 (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and
 (8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.
 
 
 [4]
 11 U.S.C. Sec. 362(b)(4) provides:
 (b) The filing of a petition under section 301, 302, or 303 of this title does not operate as a stay--
 ....
 (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power....
 
 
 [5]
 11 U.S.C. Sec. 105(a) provides: "(a) The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."
 
 
 [6]
 28 U.S.C. Sec. 1651(a) provides: "(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."
 
 
 [7]
 11 U.S.C. Sec. 362(b)(5) provides:
 (b) The filing of a petition under section 301, 302, or 303 of this title does not operate as a stay--
 ....
 (5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power....
 
 
 [8]
 11 U.S.C. Sec. 1129(a)(1) provides: "(a) The court shall confirm a plan only if all of the following requirements are met: (1) The plan complies with the applicable provisions of the chapter."
 
 
 [9]
 11 U.S.C. Sec. 502(a), (b)(2) provides:
 (a) A claim of interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.
 (b) Except as provided in subsections (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--
 ....
 (2) such claim is for unmatured interest....
 
 
 [10]
 The district court correctly applied the business necessity test in this case. The business necessity defense and the bona fide occupational qualification (BFOQ) defense are both defenses to Title VII violations. The business necessity defense, however, is appropriately raised when facially neutral employment practices have a disproportionate impact on protected groups. The BFOQ defense on the other hand is a defense to affirmative deliberate discrimination on the basis of sex. Harris v. Pan American World Airways, Inc., 649 F.2d 670, 674 (9th Cir.1980); Garcia v. Gloor, 609 F.2d 156, 163 (5th Cir.1980); see Dothard v. Rawlinson, 433 U.S. 321, 332, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977) (BFOQ) (standard applied to regulation prohibiting employment of female guards in maximum security prison; business necessity test applied to height and weight regulation). Both defenses have been construed narrowly. Sex discrimination based on a BFOQ is permitted only where "reasonably necessary to the normal operation of that particular business." 42 U.S.C. Sec. 2000e-2(e). A neutral employment practice may be justified by business necessity only if the practice not only fosters safety and efficiency but is essential to that goal. United States v. St. Louis-San Francisco R.R., 464 F.2d 301, 308 (8th Cir.1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973)
 
 
 [11]
 Rath argues that its financial position is precarious and a backpay award plus interest could result in the permanent closing of the Columbus Junction plant and the loss of jobs. Rath argues that it has had to resort to extraordinary means to secure even a limited line of credit (about $15 million), and that this credit and other loans made by Rath are secured by Rath's inventory, receivables, trademarks of the company, and real property. The company pension plan was terminated for financial reasons in 1982 and Rath continues to make sizable payments to reduce its obligations under the plan. Rath is also required to make cash deposits for performance bonds. The employees in 1983 deferred $2.50 each per hour in wages and made other concessions in order to sustain the company
 
 
 [12]
 The standard which this circuit applies in this case is consistent with the law in the majority of the other circuits. See Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 93-94 (6th Cir.1982); Jackson v. Seaboard Coastline R.R., 678 F.2d 992, 1016-17 (11th Cir.1982); Williams v. Colorado Springs School Dist., 641 F.2d 835, 840-42 (10th Cir.1981); Kinsey v. First Regional Sec., Inc., 557 F.2d 830, 837 (D.C.Cir.1977); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 245-47 (5th Cir.1974); Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)
 
 
 [13]
 EEOC indicates that prejudgment interest on the backpay actually awarded amounts to $988,272.00. This figure does not include interest on the additional backpay to be awarded as a result of our decision expanding the relevant labor pool and holding that the no-spouse rule was not justified by business necessity
 
 
 [14]
 The district court found that the interest rates requested by EEOC were rates which "no female employee could have reasonably obtained had she possessed the funds." We do not believe that a district court may deny prejudgment interest because the plaintiff requests interest at a rate which the court finds unreasonable. The district court may grant prejudgment interest at the rate which it determines to be fair and equitable. EEOC asserts that the rates used in computing the prejudgment interest were the IRS prime interest rates during the 1973 to 1980 period. We note that prejudgment interest awards based on the prime interest rates have been permitted by other courts. E.g., EEOC v. Wooster Brush Co., 727 F.2d 566 (6th Cir.1984); EEOC v. Pacific Press Publishing Ass'n, 482 F.Supp. 1291, 1319-20 (N.D.Cal.1979), aff'd, 676 F.2d 1271 (9th Cir.1982)
 
 
 [1]
 "Benefit"-type seniority refers to the use of a worker's earned seniority credits in computing his level of economic "fringe benefits." Examples of such benefits are pensions, paid vacation time, and unemployment insurance. "Competitive"-type seniority refers to the use of those same earned credits in determining his right, relative to other workers, to job-related "rights" that cannot be supplied equally to any two employees. Examples can range from the worker's right to keep his job while someone else is laid off, to his right to a place in the punch-out line ahead of another employee at the end of a workday
 Franks v. Bowman Transp. Co., 424 U.S. 747, 782 n. 1, 96 S.Ct. 1251, 1273 n. 1, 47 L.Ed.2d 444 (1976) (Powell, J. concurring in part and dissenting in part).